THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROOSEVELT BURRELL, Defendant-Appellant.

First District (3rd Division)   No. 1—88—0035

Opinion filed March 31, 1992.

---

Randolph N. Stone, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Gael O'Brien, and Maria McCarthy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a jury trial, defendant, Roosevelt Burrell, was convicted of aggravated battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—4) and the attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1, 8—4) of Thomas Ward and the attempted murder of Kevin Lucas (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1, 8—4). Defendant was sentenced to concurrent terms of 10 years' imprisonment for the aggravated battery, and 50 years' imprisonment for the attempted murder, of

Thomas Ward. He was also sentenced to a consecutive term of 30 years' imprisonment for the attempted murder of Kevin Lucas, for a total of 80 years' imprisonment. On appeal, defendant argues that (1) the trial court abused its discretion in denying his request to substitute retained counsel for appointed counsel; (2) he was denied a fair trial when the police officers' bullet-marked, bloodstained uniforms were sent to the jury room; (3) he was denied a fair trial by the prejudicial testimony concerning Officer Ward's injuries; (4) he was denied a fair trial by prosecutorial misconduct during closing argument; (5) the trial court denied him a fair trial or an effective closing argument by sustaining objections to proper comments in his closing argument; (6) his conviction for aggravated battery must be vacated under the one-act-one-crime rule or, in the alternative, his sentence must be reduced or vacated and remanded; and (7) the trial court abused its discretion in imposing an extended sentence for one count of attempted murder or in making the sentences on the attempted murder counts consecutive. We affirm in part, vacate in part and reduce sentence in part.

On January 1, 1987, defendant, Roosevelt Burrell, was charged with the attempted murders of Chicago police officers Thomas Ward and Kevin Lucas, and the aggravated battery of Thomas Ward. At trial, Pamela Rendels testified that at about 4 p.m. on December 31, 1986, she had a fight with Marvin Stewart at her home at 234 N. Hoyne Street, Chicago. Stewart is her boyfriend and the father of one of her children. Ms. Rendels went to a neighbor's home and telephoned the police to report the domestic disturbance. When she returned home, Stewart was not there.

While Ms. Rendels was on her front porch, defendant came up to her and said "hello sister-in-law, what's up?" Ms. Rendels had known defendant for years because he once dated her sister. Ms. Rendels testified that she thought defendant, wearing a long coat over an army jacket, came from the alley behind her.

As Ms. Rendels and defendant spoke, a marked squad car approached. Police officers Thomas Ward and Kevin Lucas, in uniform with bullet-resistant vests, were responding to a radio call of the domestic disturbance. As the officers drove northbound on Hoyne Street, Ward testified, he saw defendant, who was wearing a green camouflage fatigue jacket over a light-colored coat and dark pants. Ward stated that defendant turned and looked at the police officers, then turned around, walked back across the street, and walked up to the porch at 234 N. Hoyne Street, where Ms. Rendels was standing. As Ward parked the car, got out, and approached Ms. Rendels,

defendant turned around with a weapon he took from under his coat and started firing. Ward, who heard gunshots and saw muzzle flashes, was shot in the upper left chest. The gunshot knocked him backwards, and he ran to get behind the car. Before getting there, he was shot in his right side. He then dove underneath the car and began crawling towards the other side of the car. On the way to the hospital, Ward told Officer Michael Chasen that the offender was a male black wearing a green jacket or a field jacket.

Lucas testified that he got out of the car after Ward. Even though a bush was obstructing his view, Lucas saw a woman and another person standing on the porch. As he began to walk toward the front of the car, he heard gunshots and saw muzzle flash coming from the porch. Lucas stated that it was not the woman, but the other person, who was firing. As he saw Ward fall, Lucas dove for cover. He drew his weapon and looked over the car to see who was shooting at them. He then crawled to the other side of the car and pulled Ward back. Lucas radioed for help, and several patrol cars and an ambulance soon arrived.

When the shooting began, Ms. Rendels went inside and locked her door. She heard four or five gunshots and glass breaking. When she looked out again she did not see defendant. When the police arrived about five minutes later, Ms. Rendels identified defendant as the shooter and gave them a description.

Ms. Rendels further testified that she did not remember telling the police that Marvin Stewart was just leaving when she returned from her neighbor's or that she was leaving her house a second time to call the police when defendant came from the alley. There was a stipulation that Detective Harrington would testify that Ms. Rendels made those statements to him.

Ward was taken to Cook County Hospital, where he underwent surgery. The gunshot wound to his right side shattered his kidney, a portion of which was removed. A second gunshot wound went through his chest, collapsing his lung, which was repaired and reinflated. The treating physician testified that because of the severity of the wounds, Ward was classified as a grade four, meaning that his injuries were life-threatening, but survival was possible. Defense counsel objected to the testimony concerning the classification of injuries. Ward was hospitalized for 14 days, but received continuing care until July 1987. He suffered permanent injuries to his lung and his kidney. While awaiting surgery, Ward received his last rites. Although Lucas did not require medical attention, a bullet was re-

covered from the chest portion of his bullet-resistant vest and another from his clothing.

Marvin Stewart testified that after arguing with Ms. Rendels on December 31, 1986, he left because the police were being called. He walked three to four blocks to his house. He neither saw any police officers nor heard any gunshots. Stewart further testified that he never owned or handled a weapon like the one used in the shooting, and he did not shoot two uniformed police officers.

Tina Howard testified that about 5 p.m. on December 31, 1986, she was outside 2029 W. Lake Street when she heard four or five gunshots. She ran inside and went to Ms. Holloway's apartment on the seventh floor. Ms. Holloway's son, Terry, was the father of Ms. Howard's children and a friend of defendant's. About 10 or 20 minutes later, defendant arrived, out of breath, and asked if Terry or his brother were there. When Ms. Holloway answered "no," defendant asked to make a phone call. After defendant made the phone call, Ms. Howard reached into his sweater for a cigarette and saw a gun, which she identified as exhibits 33 and 34.

Defendant then borrowed some tissue, went into the bathroom, and closed the door. Shortly afterwards, defendant left. Ms. Howard testified that defendant was wearing a gray or blue or green coat with a hood, a white shirt, and a white sweater. She further testified that he was not wearing an army jacket. She did not remember telling the police about an army jacket. The parties stipulated that Detective Harrington would testify that Ms. Howard told him that defendant was wearing a blue or gray coat with a hood and an army jacket.

Police officers Steele, Keller, and Smulevitz testified that after the shooting they looked for defendant at several locations. Steele testified that he and his partner went to Ms. Holloway's apartment, where they found a loaded .30 caliber enforcer carbine and two magazines under a mattress in a bedroom. Keller stated that the family handed him and his partner a gray coat with a hood. Smulevitz testified that he recovered a field jacket at defendant's sister's apartment.

Police officer and firearm examiner Donald Smith testified that he examined the forensic evidence. The .30 caliber carbine was officially classified as a semi-automatic pistol. It was similar to the M1 carbine used during World War II and the Korean War. To be fired, each round required an independent trigger pull of approximately seven pounds. In his opinion, the carbine had fired the nine cartridge cases recovered at 234 N. Hoyne Street, the two fired bullets

recovered from the clothes of Ward and Lucas, and two bullet fragments or fired bullet jackets recovered from the trunk of the police squad car. He was unable to identify a fragment recovered from the trunk of the squad car or a fragment recovered from Lucas' vest.

An "all-call message" concerning defendant went out to all police officers on duty. Various units were looking for defendant and interviewing family members. At 3 a.m. on January 1, 1987, defendant turned himself in at the police station.

Following the closing arguments, the jury found defendant guilty of the attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1, 8—4) of Kevin Lucas and the attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1, 8—4) and aggravated battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—4) of Thomas Ward. Following a hearing, the motion for a new trial was denied.

At the sentencing hearing, two witnesses testified in aggravation. Tina Howard testified that after defendant arrived at Ms. Holloway's apartment, he made a telephone call during which she overheard him say, "I shot a police [sic]." Assistant State's Attorney Michael O'Donnell, who was assigned to felony review on December 31, 1986, testified that when he questioned defendant about the shooting of the two police officers, one who was in critical condition, defendant was laughing. The State informed the trial court that defendant had two prior convictions for theft and one prior conviction for armed robbery, for which he spent time in prison.

Eight witnesses testified in mitigation. David Wright testified that he was an Operation Sergeant for the United States Army, through which he met defendant seven years earlier. Defendant, who was qualified on a machine gun and an M-16 rifle, was part of the Reserves. Wright stated that defendant was prompt, responsible, and had been promoted prior to the shooting. Defendant always did what he was told and carried his share of the load within the unit.

Charles Hearns, who was a First Sergeant in the Army, had known defendant for five or six years. He testified that defendant was a model soldier, a hard worker, and did everything he was asked. Defendant, who went to all the unit's support missions, was there on time and did his job very well. Hearns testified that defendant had an alcohol habit and occasionally used drugs.

Walter Bush testified that he had known defendant for six years through the Army. Defendant was a good person, easy to get along with, and always happy. When asked to do something, defendant did it with no questions or back talk.

Othello Anderson testified that he is a college professor and program director at Miles Square Health Center. Thirteen years ago, defendant was one of his students, and they had kept in touch over the years. Anderson described defendant as very bright, very forthright, very honest, and interested in pursuing a career in broadcasting. He further testified that when questioned about problems and small altercations, defendant would invariably laugh due to his inability to understand or articulate what the situation was.

Titis Sims testified that he had known defendant for 12 to 15 years from the neighborhood and from school. Sims stated that defendant was a good person who was always happy. Marvin Thomas testified that he knew defendant all his life and described him as an outgoing person.

Defendant's oldest brother, Willie Burrell, testified that 12 family members were present in court and characterized defendant as quiet and always helpful. He stated that defendant was a very inquisitive person, always willing to learn something new, and not the type of person to shoot two police officers. Defendant's mother, Jessie Burrell, stated that whenever she needed defendant, he was always around. Defendant was the third youngest of 14 children. Defendant offered, "I feel very bad about what happened to the officer even, just feel very bad about it, Your Honor."

In making its ruling, the trial court stated that defendant was cool, calculating, intelligent, and resourceful. He described the crime as a planned, prepared, well-executed, and almost an execution of two Chicago police officers. The trial court sentenced defendant to concurrent sentences of 10 years' imprisonment for the aggravated battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—4) and 50 years' imprisonment for the attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1, 8—4) of Officer Ward. Additionally, defendant was sentenced to a consecutive term of 30 years' imprisonment for the attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1, 8—4) of Officer Lucas, for a total of 80 years' imprisonment.

On appeal, defendant asserts that the trial court abused its discretion in denying his request on the day of trial for a continuance to substitute retained counsel for appointed counsel. Defendant had been in custody from January 1, 1987. At his arraignment on February 13, 1987, an assistant public defender was appointed. There were two hearings in April and two in June.

On August 27, 1987, defendant requested appointment of counsel other than the assistant public defender. The trial court stated, "If you want to hire private counsel—otherwise, the public defender

is the attorney the State provides for persons who don't have funds to hire their own attorney." The assistant public defender responded that he spoke with defendant's mother, who indicated that she did not know anything about hiring a private attorney. Defendant's mother then told the trial court that she had tried to get an attorney from legal aid because the family did not have the funds to hire a private attorney.

The trial court informed defendant that unless he gave a reason why he was not being properly handled by his current attorney, his motion would be denied. Defendant responded that being ordered to go to a psychologist was enough of a reason. The trial court denied the motion, ruling that he would not continue the trial to change attorneys unless defendant wanted to hire a private attorney. The case was then continued to November 2, 1987, for trial.

Defense counsel moved to advance and reset the case for September 14, 1987, for the purpose of a plea conference. On September 14, 1987, the case was continued for two days to allow the victims to be present. On September 16, 1987, the victims were present but defendant was in the hospital. The case was set for a jury trial on November 2, 1987, when it was held on call until November 3, 1987. After the assistant public defender argued preliminary motions on November 3, 1987, the case was passed for 1½ hours at which time the jury was to be chosen.

When the case was called later that day, defendant again asked for a continuance to retain a private attorney, explaining that he had been introduced to a private attorney, who was ready to take his case, but wanted three days. The trial court denied the continuance, stating that defendant had had plenty of time to hire a private attorney. Furthermore, the trial court expounded, the attorney named had been in the courtroom that morning on another case, but said nothing to the trial court about defendant's case nor filed an appearance in the case. The jury was then chosen.

The next day, before opening statements, defendant again asked for a continuance to hire a private attorney. Defendant stated that private counsel was planning to be in court that morning, but did not appear that day. Moreover, defendant informed the trial court that he did not call the attorney on the previous day. The motion for continuance was denied, and the opening statements were heard.

While an accused's right to counsel (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §8; Ill. Rev. Stat. 1985, ch. 38, par. 113—3) is absolute and unqualified, the right to choice of counsel is

limited, although fundamental. (*People v. Spurlark* (1978), 67 Ill. App. 3d 186, 196.) The exercise of the right to choice of counsel may not be denied unless it will unduly interfere with the administration of justice. (*Spurlark*, 67 Ill. App. 3d at 196.) It is within the discretion of the trial court to determine when the defendant's right to select counsel unreasonably interferes with the orderly process of judicial administration. *Spurlark*, 67 Ill. App. 3d at 197.

In balancing the judicial interest of trying the case with due diligence and the defendant's constitutional right to counsel of choice, the court must inquire into the actual request to determine whether it is being used merely as a delaying tactic. (*People v. Washington* (1990), 195 Ill. App. 3d 520, 525.) Factors to be considered are whether the defendant has been continuously in custody, whether he has informed the trial court of efforts to obtain counsel, and whether he has cooperated with appointed counsel even though dissatisfied with that counsel. (*People v. Willis* (1972), 6 Ill. App. 3d 980, 982.) The denial of a motion for continuance to obtain new counsel is not an abuse of discretion if new counsel is not specifically identified or does not stand ready, willing, and able to make an unconditional entry of appearance *instanter. People v. Cole* (1977), 47 Ill. App. 3d 775, 779.

The State maintains that the defendant waived this issue because he did not raise it in his motion for a new trial. Failure to raise an issue in the written motion for a new trial constitutes a waiver of that issue. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282.) Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), however, provides an exception to the waiver rule where there has been plain error if it is plainly apparent from the record that an error affecting substantial rights was committed or where the evidence is closely balanced. (*Pickett*, 54 Ill. 2d at 283.) Although the defendant failed to preserve the issue for review by including it in his post-trial motion, the right to counsel of choice is a fundamental right. (*Spurlark*, 67 Ill. App. 3d at 196.) Therefore, we will consider the issue to determine whether it was plain error.

Both defendant and the State cite cases that are distinguishable. Defendant cites cases that were reversed because the trial court did not inquire into the defendant's assertions. See *People v. Green* (1969), 42 Ill. 2d 555 (church had paid for private attorney, who had not yet filed an appearance and was not present in court on the day of trial); *Washington*, 195 Ill. App. 3d 520 (court received a call from the secretary of the private attorney the defendant claimed to have retained and the assistant public defender in-

formed the court that he had the name of the retained private attorney).

The State cites cases where the trial court's denials of the motion for a continuance to retain new counsel were affirmed. See *People v. Washington* (1968), 41 Ill. 2d 16 (defendant's private attorney filed an appearance four months earlier, defendant was responsible for earlier trial delay, no particular need was stated for changing attorneys, and no dissatisfaction was expressed until the day of trial); *People v. Winfield* (1987), 160 Ill. App. 3d 983 (there had been 10 continuances previously granted, the trial date was delayed five months, defendant was out on bail and never complained of the quality of representation from the assistant public defender); *People v. Solomon* (1962), 24 Ill. 2d 586 (assistant public defender had been appointed two weeks before trial, but the defendant refused to cooperate with him).

Although these cases are all distinguishable, they provide general guidelines. Here, the assistant public defender had been appointed nine months earlier and was prepared to go to trial. Although defendant was in continuous custody for 11 months, he had ample time to retain private counsel. When defendant had asked for a new attorney four months earlier, the trial court informed him that the only way he would get another attorney was if he retained private counsel, which defendant did not do. Defendant's mother informed the trial court that the family had attempted to retain private counsel, but lacked adequate funds.

When defendant again raised the issue on the day of the trial, he told the trial court that he had just met a private attorney who was willing to take his case. The attorney, however, did not file an appearance or make any attempt to inform the court of his involvement with the case. Although the attorney had been present in the courtroom on another case, he gave no indication to the trial court of his intention to take defendant's case. Defendant stated that the attorney would be present in court on November 3, 1987, but he never appeared. While the attorney's name was given to the trial court, there was no evidence that the attorney was ready, willing, or able to take the case. The trial court did inquire whether defendant had called the attorney on the previous day and defendant replied that he had not called. Consequently, the trial court did not abuse its discretion in denying defendant's motion for a continuance to retain private counsel.

Defendant next asserts that he was denied a fair trial when, over defense objection, the police officers' bullet-marked and blood-

stained uniforms were sent to the jury room during deliberations. Defendant argues that since the primary issue was the offender's identification, the uniforms were not relevant or material to any issue that the jury had to decide. He cites cases where the court ruled that evidence was improperly submitted to the jury. (See *People v. Arnold* (1910), 248 Ill. 169; *People v. Elwell* (1977), 48 Ill. App. 3d 628; *People v. Garlick* (1977), 46 Ill. App. 3d 216; *People v. Manley* (1971), 133 Ill. App. 2d 882.) Defendant also argues that the clothing was not ordinary clothing, but official police uniforms, which are symbols charged with emotion.

The State responds that the uniforms were relevant to the issues of great bodily harm and the intent to kill. It contends that the location of the bullet holes in the victims' clothing was probative as to whether defendant had the intent to kill the officers when he fired bullets in their direction. Furthermore, the State argues, the bullet holes and bloodstains on Officer Ward's clothing were relevant to show that defendant intended to cause great bodily harm. The State cites cases where the evidence submitted to the jury was relevant to issues that the jury was to decide. See *People v. Shum* (1987), 117 Ill. 2d 317; *People v. Morando* (1988), 169 Ill. App. 3d 716.

Since evidence present in the jury room during deliberations gives the party producing it a distinct advantage (*People v. Kirkpatrick* (1953), 413 Ill. 595, 599), potentially prejudicial evidence must be closely scrutinized. (*Manley*, 133 Ill. App. 2d at 884.) If tangible objects that have been admitted into evidence are relevant to any material issue, they can go into the jury room during deliberations (*People v. Arnold* (1985), 139 Ill. App. 3d 429, 435) unless they are more prejudicial than probative. If the evidence is prejudicial such that it serves only to arouse and influence the emotions of the jury, it is error to submit it to the jury. (*Elwell*, 48 Ill. App. 3d at 630.) Even if none of the evidence is admissible, however, there is no need for a new trial unless the defendant is prejudiced. *People v. Greer* (1980), 79 Ill. 2d 103, 117.

■ While the police officers' clothes were probative to the issues of intent to kill the officers and great bodily harm on the aggravated battery charge, their prejudicial effect outweighed their probative value. The jury saw the shirt, bullet holes, and blood during the trial. Lucas even put his fingers through the bullet holes during his testimony. The error, however, was harmless because the evidence of defendant's guilt was overwhelming and the extent of the injuries was severe.

■ Defendant waived his argument that he was denied a fair trial by prejudicial testimony that Officer Ward's injuries were graded life-threatening, that his last rites were administered, and that he was awarded the Chicago police department blue star for those seriously injured in the line of duty. Defendant did not object to that testimony at trial and did not include it in his post-trial motion. Since the evidence showed overwhelmingly that defendant was guilty and the complained-of testimony did not involve substantial rights, it is not plain error.

■ Defendant also waived his objections to the State's closing argument comments concerning the risks taken by police officers on the job, Officer Lucas' medal of honor, that the defense counsel wanted the jury to believe that Officer Ward lied under oath, and that the jury should return to the police officers the service and protection they gave to the jurors each and every day of their lives. Failure to object to closing remarks at trial and not including the issue in the post-trial motion generally constitutes waiver of the issue. (*People v. Threadgill* (1988), 166 Ill. App. 3d 643, 650.) These comments did not constitute prejudicial error in this case.

■ Defendant then asserts that the State improperly commented on the prosecution witnesses' lack of motivation to lie or to frame defendant for the offenses. The cases defendant cites are inapplicable. The courts in *People v. Ferguson* (1988), 172 Ill. App. 3d 1, and *People v. Cole* (1980), 80 Ill. App. 3d 1105, ruled that it was improper to inform the jury that it must find that every State witness was lying in order to believe the defense witnesses. The State's comments here properly addressed the issue of the witnesses' credibility by discussing their lack of motivation to lie and to conspire against defendant.

The State's rebuttal comments, which defendant claims to be improper, were invited by the defense's closing argument. A defendant may not claim he has been prejudiced by comments made by the State that were invited or provoked by the defense counsel. (*People v. Barney* (1982), 111 Ill. App. 3d 669, 677.) During his closing argument, the defense counsel alluded to the police officers' "emotional bent to get this case solved, to get someone arrested and to get to the bottom of what they think the bottom of this case is. *** They are emotionally ridden in this case." The defense also stated that Pamela Rendels' testimony did not make sense and that someone other than the defendant did the shooting. To find defendant not guilty, the State properly rebutted that the jury would have

to believe that Officer Ward wanted the real offender to walk the street just to convict defendant.

Defendant then asserts that the State improperly commented upon his opening statement. His argument has no merit.

Further, defendant contends that the State improperly commented that the defense's closing statement did not mention Tina Howard's testimony. The State maintains that its remarks about Tina Howard in rebuttal were in response to the defense counsel's comments that defendant was not the man who shot the police officers. The State asserts that it was reminding the jury of Ms. Howard's testimony about events immediately after the shooting, including her observation of defendant's clothing and the gun that the ballistics expert testified fired the shots which injured the police officers.

New arguments should not be allowed in rebuttal, but should be restricted to answering the arguments put forth by defense counsel. (*United States v. Taylor* (7th Cir. 1984), 728 F.2d 930, 936-38.) Although the rebuttal about Ms. Howard improperly raised new arguments since her testimony was not addressed in the defense counsel's closing argument, it did not prejudice defendant and was, therefore, harmless error.

Defendant's assertion that he was denied an effective closing argument and a fair trial because the trial court twice improperly sustained objections to his proper closing arguments is without merit. The State's objection to the defense comment that Officer Ward identified defendant as the offender for the first time since the shooting was properly sustained because the defense counsel was arguing evidence that was not in the record. Likewise, the trial court properly sustained the State's objection to the defense counsel's improper statement about the law. The defense counsel argued that because the police did not investigate Marvin Stewart, "[t]here was doubt who committed the crime, and if there is doubt as to who committed the crime—." In sustaining the objection, the court commented that counsel's argument was not a proper statement of the law. It is well-established law in Illinois that it is improper for counsel to define "reasonable doubt" for a jury. (*People v. Faysom* (1985), 131 Ill. App. 3d 517, 524.) The defense counsel was not only defining "reasonable doubt" for the jury, he was changing the standard from reasonable doubt to any doubt.

Finally, defendant asserts various sentencing errors. Defendant asserts that his conviction for aggravated battery must be vacated because it arose out of the same physical act as his conviction for

the attempted murder of Ward or, in the alternative, his sentence for aggravated battery must be reduced, vacated or remanded since it was an improper extended-term sentence.

The State contends that the defendant waived the issue because he did not object at trial or raise the issue in a post-trial motion. In order to preserve errors which occurred at the sentencing hearing, a defendant is not required to file a post-sentencing motion seeking a new sentencing hearing. (*People v. Hargis* (1983), 118 Ill. App. 3d 1064.) Since the alleged error took place after the motion for a new trial had been filed, heard, and denied, there is no duty to file a post-sentencing motion.

While defendant failed to object to the imposition of aggravated battery and attempted murder sentences, the alleged errors clearly affected defendant's fundamental right to liberty and impinged on his right not to be sentenced based on improper factors. (*People v. Martin* (1988), 119 Ill. 2d 453, 458.) Because the issue raised by defendant affects substantial rights, it will be reviewed under the plain error rule.

■ A defendant who commits more than one criminal act in an episode or transaction may be prosecuted for more than one offense unless the charges involved precisely the same physical act. (*People v. Segara* (1988), 126 Ill. 2d 70, 75-77.) Officer Ward was struck in the chest and abdomen by two separate bullets from defendant's gun, constituting two separate acts. Therefore, it was proper for the jury to convict defendant of both attempted murder and aggravated battery.

■ Defendant next asserts that the trial court abused its discretion in imposing an extended sentence of 50 years' imprisonment for the attempted murder of Thomas Ward based on the brutal and heinous nature of the crime, indicative of wanton cruelty. An extended-term sentence may be imposed if the court finds the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, or the defendant has a history of prior criminal activity. (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.2, 1005—8—2.) The trial court did not abuse its discretion in sentencing defendant to an extended term for the attempted murder of Thomas Ward because it found that the crime was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. The shooting was systematic, unprovoked, continued after Officer Ward was struck, and lacked any logical reason. Furthermore, defendant laughed about the crimes hours later at the police station.

The extended-term sentence for aggravated battery, however, must be reduced. Under Illinois law, an extended-term sentence can only be imposed for the conviction of the most serious class of offenses which a defendant has been convicted of committing. (*People v. Jordan* (1984), 103 Ill. 2d 192, 205-06.) In this case, attempted murder is the most serious class of offense. Therefore, defendant's sentence for aggravated battery is reduced from 10 years' to 5 years' imprisonment, which is the maximum allowed for aggravated battery, a Class 3 felony. Ill. Rev. Stat. 1985, ch. 38, pars. 12—4(e), 1005—8—1(a).

■ Finally, defendant contends that the trial court abused its discretion in making both the attempted murder sentences consecutive. We agree. Consecutive sentences are to be imposed only where the nature and circumstances of the offense and the history and character of the defendant indicate that a consecutive term is required to protect the public from further criminal conduct of the defendant. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4.) That was not the situation in this case. The consecutive sentence was not required and was error.

Based on the foregoing, the judgment of the circuit court regarding the two attempted murder convictions is affirmed. The extended-term sentence of 50 years' imprisonment for the attempted murder of Thomas Ward is affirmed, to run concurrently with the sentence of 30 years' imprisonment for the attempted murder of Kevin Lucas. The consecutive sentence is vacated. The aggravated battery conviction is affirmed, but the extended-term sentence for the aggravated battery is reduced from 10 years' imprisonment to 5 years' imprisonment, to run concurrently with the sentence of 50 years' imprisonment for the attempted murder of Thomas Ward.

Affirmed in part; vacated in part and sentence reduced in part.

GREIMAN, P.J., and TULLY,* J., concur.

---

*Justice White heard oral argument prior to his retirement. Justice Tully was substituted, reviewed the briefs and the record and concurred with the opinion.