THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOE CHAMPS, Defendant-Appellant.

First District (3rd Division)   No. 1—93—2404

Opinion filed June 28, 1995.

Rita A. Fry, Public Defender, of Chicago (Greg Koster, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Barbara L. Jones, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, Joe Champs, was found guilty of first degree murder (720 ILCS 5/9—1(a)(3) (West 1992)) and two counts of armed robbery (720 ILCS 5/18—2(a) (West 1992)). He was sentenced to an extended-term sentence of 90 years' imprisonment on the basis that the crime was exceptionally brutal and heinous. Concurrent sentences of 30 years' imprisonment were imposed on each of the armed robbery convictions.

On appeal, defendant asserts that (1) the trial court erred in failing to find a *prima facie* case of racial discrimination in the State's use of peremptory challenges; (2) the trial court erred in refusing his request that a mugshot photo array be cropped before publication to the jury; and (3) his sentence was excessive because the murder was not exceptionally brutal or heinous or indicative of wanton cruelty. Based on the following reasons, we reverse and remand.

On October 16, 1990, Andre Eagle, Timothy Jones, Keith Kalley, David Redmond, Lorenzo Shelton, and Joseph Dobine were sitting on a porch at 6242 S. Honore Street in Chicago. Several of the men were drinking and at least one was selling drugs.

Timothy Jones and David Redmond testified that a car went by the house twice around 11:30 p.m. Another man, Damion Jones, who is Timothy Jones' nephew, testified that he was standing a block away when he noticed a loud, two-toned beige car circle the block twice. Damion watched as the car parked in an alley four or five houses away. A tall man and two shorter men got out of the car and walked down the alley.

According to Timothy Jones and Redmond, three men came out of the alley toward the porch. One of the men, who was wearing a long leather coat and was later identified as defendant, asked who was selling drugs and announced a stickup. After Timothy Jones stated that he was selling drugs, defendant put a gun described as a machine gun or Uzi to his head and told him that he would be the first to die. Defendant and the second man ordered the victims to lie on the porch on their stomachs, searched them, and took wallets

from the victims and a ring from Redmond. Defendant threatened to kill Redmond and eventually hit him in the head with the gun. The second man grabbed Shelton and put a gun to his head asking "where the stuff at?" and then took him to a building across the alley. The third man acted as a lookout.

According to Redmond, the second man and Shelton returned while Lament Harris was still across the street. One of the short men saw Harris and told him to come across the street or he was going to shoot Shelton. Harris obeyed. The men then ordered all the victims into the alley and onto their knees with their hands behind their heads. Defendant told them that they were all going to get a head shot. Dobine pushed defendant and all the victims ran. As Redmond was running, he heard shots.

On October 23, 1991, the police came to Redmond's house and showed him several photographs. He identified defendant from the photo array and picked him from a lineup on January 31, 1991.

According to Timothy Jones, when Shelton returned from trying to get into the building across the alley, Harris was with him. They stood in the alley as the second man walked up the porch stairs. Defendant told him to give each of the victims a head shot. At that point, Dobine jumped up and pushed the second man. His gun went off and all the victims ran separate ways.

Four days later on October 20, 1991, Jones looked through mugshot books at the police station. After he identified defendant's picture in the book, a police officer showed him several loose photos. Jones made a positive identification of defendant from the photo array and later identified him from a lineup.

Lament Harris, who lived across the street, noticed his friends on the porch at 6242 S. Honore Street. As he started to go over to see them, defendant turned toward him and told him that he would shoot him or his friend Shelton if he tried to run. Defendant held the gun to Shelton's head and ordered Harris to come across the street. When Harris crossed the street and walked toward the alley, defendant approached him and led Shelton and Harris into the alley next to the house. All the other victims were lying on the porch. Defendant asked Harris where he got his shoes. After Harris responded that his aunt had bought them for him, defendant hit him on the head with the gun.

According to Harris, defendant ordered him and Shelton onto their knees and the other victims were told to go into the alley and get on their knees. Defendant told the victims that he was going to shoot each of them in the head with a single shot. While the other victims were still on the porch, someone pushed defendant and all

the victims ran. Harris heard several gunshots. On January 23, 1991, Harris identified defendant from a lineup.

When the shooting stopped, Eagle was dead. He had been shot twice, once in the neck and once in the back. Eventually, defendant was arrested on January 22, 1991.

Defendant testified that he was with his girl friend, Jeanette Winters, at their apartment at 5217 S. Paulina Avenue, Chicago, at the time of the murder and robberies. Winters corroborated his testimony. She also testified that defendant did not own a black leather coat, but wore a Charlotte Hornets jacket.

There was no bullet or fingerprint evidence. Dr. Shaku Teas, who performed the autopsy, testified that Eagle died from gunshot wounds to his right neck and right back, which were not inflicted at close range.

During jury selection, three of seven African-American prospective jurors were excused for cause. The State used three of its five peremptory challenges on the remaining African-American veniremembers and one African-American juror served on the jury. The trial court denied defendant's motion under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, after finding that he did not establish a *prima facie* case that the "State ha[d] systematically excluded blacks on the jury."

Prior to deliberations, defendant objected to publishing to the jury the uncropped mugshot photo array from which Timothy Jones, Redmond, and Harris identified defendant. The trial court denied defendant's motion to crop the mugshot information from the photographs.

Following deliberations, the jury found defendant guilty of first degree murder and two counts of armed robbery. He was acquitted of one count of armed robbery.

At the sentencing hearing, the State introduced certified copies of defendant's two 1989 robbery convictions for which he was sentenced to concurrent three-year sentences. The trial court found that although defendant was eligible for the death penalty, it sentenced him pursuant to section 5—5—3.2(b) of the Unified Code of Corrections (730 ILCS 5/5—5—3.2(b) (West 1992)) to an extended-term sentence of 90 years' imprisonment and two concurrent terms of 30 years' imprisonment for the two armed robberies. The trial court found that defendant's conduct had been exceptionally brutal and indicative of wanton cruelty.

Defendant's first assertion is that the trial court improperly used the "systematic discrimination" standard in finding no *prima facie* case of purposeful discrimination. Defendant relies on *People v. Wiley*

(1993), 156 Ill. 2d 464, 474-75, 622 N.E.2d 766, where the Illinois Supreme Court commented on the trial court's references to systematic discrimination exclusion:

> "Although we cannot conclude on the present record that the trial court undertook a strict and literal application of the outdated *Swain* [*v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824] test in the instant cause, we nevertheless find the remarks made by the trial court were improper and misguided. Their occurrence is an integral part of our decision to remand the matter for further *Batson* proceedings."

Defendant contends that the trial court's finding was against the manifest weight of the evidence and the prosecution should have been called upon to provide reasons for its peremptory challenges. He asks that this case be remanded for a hearing with respect to whether the State can produce race-neutral reasons for its exercise of peremptory challenges and whether the prosecution's use of peremptory challenges violated the *Batson* standards.

After comparing the State's peremptory challenges against African-American veniremembers (60%) with the veniremembers not excused for cause who were African-American (19%), defendant adds that two of the three excluded veniremembers had the potential to be prosecution-oriented jurors.

In response, the State asserts that the trial court applied the correct standard and properly found that defendant failed to establish a *prima facie* case of purposeful discrimination. The State stresses that great deference should be given to the trial court's finding of no *prima facie* case of discrimination.

The State is mistaken in its use of the deference standard for a *prima facie* case. Since the trial court's determination on the ultimate issue of discrimination is a finding of fact which turns on an evaluation of the credibility, it is entitled to great deference on appeal (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21) and will not be reversed unless it is clearly erroneous. *Hernandez v. New York* (1991), 500 U.S. 352, 369, 114 L. Ed. 2d 395, 412, 111 S. Ct. 1859, 1871; *People v. Hudson* (1993), 157 Ill. 2d 401, 426, 626 N.E.2d 161.

In contrast, the standard for the determination of the *prima facie* case is that the trial court's decision as to the *prima facie* case will not be overturned unless it is against the manifest weight of the evidence. (*Hudson*, 157 Ill. 2d at 426; *People v. Andrews* (1992), 146 Ill. 2d 413, 425, 588 N.E.2d 1126.) The *prima facie* finding is a preliminary finding before the State gives its race-neutral reasons and the trial court makes the ultimate determination.

Of the 28 persons originally questioned, there were seven African-American veniremembers. Three African-American and four non-African-American veniremembers were excused for cause. Of the remaining 21 veniremembers not excused for cause, four (19%) were African-American. The State used three of its five peremptory challenges against African-American veniremembers (60%) and 1 of the 12 jurors seated was African-American (8.3%).

The State cites *People v. Edwards* (1991), 144 Ill. 2d 108, 154, 579 N.E.2d 336, for the proposition that a *prima facie* case may not exist even if the excluded black veniremembers did not share any identifiable characteristic other than race. That is a mischaracterization of the *Edwards* case, where the court considered that factor along with other factors. Moreover, *Edwards* did not make a ruling on the *prima facie* case because it was a moot issue. *Edwards*, 144 Ill. 2d at 154.

The State also relies on *People v. Henderson* (1990), 142 Ill. 2d 258, 288, 568 N.E.2d 1234, where the court concluded that only two factors tended slightly to suggest purposeful discrimination. The court found that the level of black representation on the jury as compared to the venire supported a mild inference of discrimination because 30% of the available venire was black, but only 21% of the jury was black; and of the veniremembers accepted by the prosecution, 19% were black, making a slight discrepancy between the level of black representation on the venire (30%) and that on the jury (21%). (*Henderson*, 142 Ill. 2d at 288.) All the remaining factors tended to refute the idea of discrimination, weighed neutrally in the balance, or mildly tended to suggest discrimination. (*Henderson*, 142 Ill. 2d at 288.) Thus, the court found that the trial court's finding was not against the manifest weight of the evidence. *Henderson*, 142 Ill. 2d at 291.

In *Batson* (476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712), the Supreme Court established that the equal protection clause of the fourteenth amendment prohibits the State from using peremptory challenges to strike potential jurors solely on the basis of their race. (*Hudson*, 157 Ill. 2d at 425.) To determine whether or not the State used its peremptory challenges to remove veniremembers on the basis of race, the defendant must first establish a *prima facie* case of purposeful discrimination in the State's exercise of its peremptory challenges. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723; *Hudson*, 157 Ill. 2d at 425.) Once the trial court determines that a defendant has made a *prima facie* showing, the burden shifts to the State to provide a clear and reasonably specific race-neutral explanation for challenging each veniremember in question. *Batson*, 476 U.S. at 97 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1723 n.20; *Hudson*, 157 Ill. 2d at 426.

A *prima facie* showing of discrimination under *Batson* must raise, from all the surrounding circumstances, a reasonable inference that the prosecutor exercised peremptory challenges to exclude venire-members from the jury because of their race. (*Wiley*, 156 Ill. 2d at 473; *Andrews*, 146 Ill. 2d at 424.) In making a determination whether defendant established a *prima facie* case of discrimination, the court must consider all facts that reasonably indicate or refute purposeful discrimination by the prosecution, not just the number of challenges exercised against African-American veniremembers. *Henderson*, 142 Ill. 2d at 287.

For purposes of establishing a *prima facie* case, relevant factors from which an inference of discrimination can be drawn are: (1) a pattern of strikes against African-American veniremembers; (2) a disproportionate number of peremptory strikes against African-American veniremembers, especially when so disproportionate as to present a pattern; (3) the level of African-American representation on the jury as compared to the venire; (4) the prosecutor's questions and statements during *voir dire* and while exercising peremptory challenges; (5) whether the excluded African-American veniremem-bers were a heterogeneous group sharing race as their only common characteristic; and (6) the race of the defendant, victim, and wit-nesses. *Hudson*, 157 Ill. 2d at 426; *Wiley*, 156 Ill. 2d at 473-74.

The exclusion of even one minority veniremember on the basis of race is unconstitutional. (*Wiley*, 156 Ill. 2d at 476.) At the *prima facie* phase of the inquiry, the court is only concerned with whether the stricken African-American veniremembers shared any characteristics other than race not to search for possible reasons for the prosecution's strikes or for similarities between stricken African-American and ac-cepted white veniremembers. *Henderson*, 142 Ill. 2d at 290.

After considering all the surrounding circumstances, we find that defendant established a *prima facie* case of purposeful discrimi-nation in the State's exercise of its peremptory challenges and the trial court's decision was against the manifest weight of the evidence. Of the original 28 veniremembers, seven, including three African-Americans, were excused for cause. Of the 21 remaining veniremem-bers, four (19%) were African-American. The State used three of its five peremptory challenges against African-American veniremembers (60%) and 1 of the 12 jurors seated was African-American (8.3%). The State's use of 60% of its peremptory strikes against African-American veniremembers (19%) was so disproportionate that it pre-sented a pattern; and the level of African-American representation on the jury (8.3%) was disproportionate compared to the venire (19%).

Excused veniremember Joan Scott Tabb is a school teacher mar-

ried to a truck driver. They have no children and rent their home. She has a college degree from Chicago State University; does not belong to any groups; enjoys sewing; and reads the Sun-Times and Better Homes and Gardens. In addition, she has friends on the police department, knows Judge Cousins, and her nephew was murdered by a group of youths.

Bernetta Rucker is a divorced data analyst with one adult child. She owns her home and is involved in the Catholic Church. She attended college for two years and enjoys jazzercize and reading the Tribune, Consumer Reports, and Money Magazine.

Thurmond Neal, 63 years old, is a married, retired security officer. He owns his home, where he has lived for 20 years. Twenty-five years ago, he received six months' supervision for the crime of unlawful use of a weapon. Neal has a high school education, five adult children, and enjoys baseball. He reads the Sun-Times and the Defender.

Although there may be possible reasons for Neal and Tabb to be excused by the State, we see no reason for Rucker to have been excused. As a result, there is a reasonable inference that the State exercised its peremptory challenges to exclude veniremembers from the jury because of their race. Since the exclusion of even one African-American for racial reasons is unconstitutional, we find that defendant established a *prima facie* case of purposeful discrimination. We reverse this case for a hearing where the State must give race-neutral reasons for its exclusions of Neal, Tabb, and Rucker before the trial court decides whether there was a *Batson* violation.

Defendant's next assertion is that the trial court erred in refusing his request that a mugshot photo array be cropped before being published to the jury. Defendant argues that the publication of his uncropped mugshot graphically and powerfully communicated to the jury that he is a criminal. Although defendant concedes that the photographs themselves may have been probative of the issue of identification, he contends that the included police information was entirely irrelevant to any issue. The State argues that the publication of the uncropped photographs did not prejudice defendant, who testified on direct examination that he had two prior convictions for robbery and was released from the penitentiary in August of 1990, two months prior to this murder and armed robberies. Defendant also presented photographs of himself with relatives at the Danville Correctional Center.

While mugshots suggest other criminal activity, they may be admitted if they are probative of the issue of the defendant's identity and the manner in which the identification was made. (*People v. Jones* (1993), 156 Ill. 2d 225, 239, 620 N.E.2d 325; *People v. Robinson*

(1984), 125 Ill. App. 3d 1077, 1079, 467 N.E.2d 291.) Even if the mugshots were not admissible, there is no need for a new trial unless the defendant is prejudiced. *People v. Burrell* (1992), 228 Ill. App. 3d 133, 144, 592 N.E.2d 453; *People v. Greer* (1980), 79 Ill. 2d 103, 117, 402 N.E.2d 203.

■ Although the mugshots were probative of the issue of identification, it would have been preferable to have cropped the police information from them. Nevertheless, the error is harmless error since the mugshots did not prejudice defendant, who testified to his criminal history and prior incarceration, even showing photographs of himself while at Danville Correctional Center. As a result, the jury was made aware of defendant's criminal history and his prior incarceration through his own testimony. However, if there is a new trial due to a *Batson* violation, the mugshots should be cropped before being published to the jury.

Finally, defendant challenges his 90-year sentence as being excessive on the basis that the murder was not exceptionally brutal or heinous or indicative of wanton cruelty. We disagree. An extended-term sentence may be imposed if the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. (730 ILCS 5/5—5—3.2(b)(2) (West 1992).) In evaluating the brutality or heinousness of the conduct, the trial court must evaluate all the facts surrounding the incident. (*People v. Nester* (1984), 123 Ill. App. 3d 501, 504-05, 462 N.E.2d 1011.) Behavior is exceptionally brutal and heinous where the shooting is systematic, unprovoked, continues after the victim has been struck, and lacks any logical reason. (*Burrell*, 228 Ill. App. 3d at 147.) Cruelty is a disposition to inflict pain or suffering. (*People v. Cox* (1983), 113 Ill. App. 3d 136, 139, 446 N.E.2d 1280.) A single act that causes death or injury may be sufficient to demonstrate exceptionally brutal or heinous behavior. (*People v. McGee* (1984), 121 Ill. App. 3d 1086, 1090-91, 460 N.E.2d 843.) Moreover, the defendant's failure to manifest remorse for his act is an important factor in establishing wanton cruelty. *Burrell*, 228 Ill. App. 3d at 147; *McGee*, 121 Ill. App. 3d at 1091.

■ We affirm defendant's 90-year sentence on the basis that it was exceptionally brutal, heinous, and indicative of wanton cruelty. After robbing the victims using an Uzi machine gun as a weapon, defendant hit two of them in the head with the gun, lined them up on the porch and then in the alley, forced them to their knees, and told them that he was going to kill them one by one. The victims were unarmed and defenseless. When the murder victim attempted to run, defendant shot him in the neck and in the back. Later, defendant showed no remorse. Not only did he not speak prior to sentencing,

but he also was uncooperative with the probation officer who attempted to prepare a presentence investigation report. As a result, we conclude that the trial court did not abuse its discretion in sentencing defendant to an extended-term sentence of 90 years' imprisonment.

Based on the foregoing, we reverse the circuit court's judgment and remand this case for the second part of the *Batson* hearing, where the State must give race-neutral reasons for its peremptory challenges against African-Americans. If the circuit court ultimately determines that there was no *Batson* violation, defendant's conviction and sentence are affirmed. If, however, the trial court determines that a *Batson* violation occurred, we order a new trial.

Based on our determination that the cause must be remanded, we must consider the sufficiency of the evidence in order to protect defendant's constitutional right against double jeopardy. (*People v. Reynolds* (1994), 257 Ill. App. 3d 792, 806, 629 N.E.2d 559.) Although we are not making a finding as to defendant's guilt or innocence that will be binding in a new trial, we conclude that the evidence presented at trial was sufficient for a jury to decide that defendant was guilty beyond a reasonable doubt.

Reversed and remanded.

GREIMAN, P.J., and TULLY, J., concur.