THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNATHAN CHILDRESS, Defendant-Appellant.

First District (6th Division)   No. 1—94—0952

Opinion filed November 17, 1995.

EGAN, J., dissenting

Gary Sternberg, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Timothy Felgenhauer, and Cathleen A. Dillon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RAKOWSKI delivered the opinion of the court:

Following a jury trial, defendant was found guilty of two counts of armed robbery and seven counts of aggravated criminal sexual assault. He was sentenced to 50 years for each aggravated criminal sexual assault to run concurrent, and to 15 years for each armed robbery, to run consecutive to the aggravated criminal sexual assault sentence. On appeal, defendant contends: (1) he was denied his right to counsel of choice; (2) the trial court conveyed improper impressions to the jury; (3) the trial court erred in refusing to give a lesser included offense instruction; and (4) the State failed to prove him guilty beyond a reasonable doubt. We reverse and remand.

Defendant was indicted for aggravated criminal sexual assault and armed robbery for events which occurred on November 19, 1992, involving three separate women, R.C., L.M., and V.G. The indictments were consolidated for trial. Because defendant contends the evidence was insufficient to prove him guilty beyond a reasonable doubt, a somewhat lengthy recitation of the facts is necessary.

R.C.

R.C. testified that on November 19, 1992, at approximately 12:30 a.m., she was walking home from a friend's house. A man grabbed her from behind, putting his left arm around her neck and holding a gun to her right temple. She heard the gun click and the man said, "Bitch, you're going with me. Hold your head down." R.C. turned

around and saw the man's face. She identified defendant in court. After R.C. looked at defendant, he told her to put her head down and walk with him. They walked past two houses, at which time she saw a black Blazer with silver trim. Defendant opened the door and R.C. saw another man sitting in the driver's seat. She identified codefendant in court.

After defendant and R.C. got in the back seat, defendant told codefendant to drive. Defendant ordered R.C. to take her clothes off. He unzipped his pants and told R.C. to "suck his—give him some head." Defendant had the gun pointed at R.C.'s head. While R.C. performed oral sex on defendant, codefendant sat in the front seat watching. After this, defendant made R.C. turn over, holding the gun to her head, and performed anal sex for about five minutes. He then ordered R.C. to turn over and had vaginal intercourse for another five or six minutes.

When defendant finished, he and codefendant switched seats and R.C. performed oral sex on codefendant until he ejaculated. R.C. did not know where the gun was at this time.

After switching places again, defendant, with the gun in his hand, asked codefendant, "Should we kill this bitch?" and codefendant replied, "No. It's not that serious." Defendant asked R.C. if she had any money, she said $20, and defendant took it out of her pocket. Defendant told her to put her coat on, he put a hat on her head, and pushed her out of the Blazer. While cocking the gun and pointing it towards R.C.'s chest, defendant told her to turn around, cover her head, keep walking, and not to look back or he would shoot her.

After returning home, R.C. called the police. When they came, she told them she had been raped and they took her to the hospital. After leaving the hospital, she went to the police station to view a lineup. R.C. immediately identified defendant and codefendant as the two assailants.

R.C. told the first set of officers, concerning the sequence of events, that she had anal intercourse with defendant, then anal intercourse with codefendant, and then vaginal intercourse with both. She told the second set of officers she had anal, vaginal, and oral sex with defendant and then anal, vaginal, and oral sex with codefendant.

R.C. did not remember if the police questioned her as to whether either man ejaculated, but she stated she told them one did. Defendant ejaculated in her vagina but she did not remember if she told the police this. R.C. also did not remember if she told the police about the conversations between defendant and codefendant or about the "kill the bitch" comment.

Officer Kinasz testified on behalf of the State. He and his partner,

Officer Hardesty, received an assignment at approximately 12:30 a.m. to meet a criminal sexual assault victim at her home. As they exited their car, R.C. approached them and said she had been raped. According to Kinasz, R.C. was "[v]isually shaken, hysterical, emotionally upset," and crying. The officers took R.C. to the hospital. Kinasz interviewed R.C. in the car en route to the hospital and at the hospital, taking notes each time. He made his report from the interviews and notes and included the details of the rape, in summary fashion.

R.C. described the gun as a bluesteel revolver. She told Kinasz the first sexual encounter involved forced anal sex with defendant. Kinasz did not remember if he asked R.C. whether either man ejaculated and did not recall if she offered this information. He stated that R.C. did not tell him she had conversations with defendants. He also did not recall if R.C. told him defendant threatened to kill her. Kinasz did not recall R.C. telling him she was grabbed off the street with a gun to her head nor did he remember her saying that when she was let out of the car, defendant put the gun to her head and she heard a click.

## L.M.

L.M. testified that on November 19, 1992, between 12:30 and 1 a.m., she was walking home from a neighborhood store. As she crossed the street, she noticed a black Blazer with one headlight out parked on the street. L.M. slowed down because the car looked familiar. A slim man with long hair and light skin got out with a gun. L.M. could see his face. The man grabbed her by the arm, put a gun to her right side, and told her to get in the Blazer. L.M. identified defendant in court. Defendant pushed her into the Blazer and forced her head to the floor. As she was pushed into the car, she saw another man, in the driver's seat, whom she described as heavy set. L.M. could see the side of his face and she identified codefendant in court.

After driving around for five minutes, defendant ordered L.M. to take off her pants, shoes, and socks. Codefendant got in the back seat because defendant told him he was going first. Defendant exited the vehicle and L.M. did not know where he went. When codefendant got in the back seat he was naked. He had vaginal intercourse with her for about 10 minutes. According to L.M., the gun was in the front seat and defendant had told codefendant to use it if he had any problems. After finishing, codefendant exited the car and defendant got back in. He inserted his penis in her rectum, which lasted for 10 minutes. Defendant had vaginal intercourse with L.M. for another 10

minutes. Defendant then sat L.M. on top of him with her back facing him. He again inserted his penis in her. After that, he told her to put her clothes on.

After L.M. dressed, defendant displayed the gun and said "he was going to walk [her] through this gangway and [when they] get through the gangway, make a left and keep walking. If [she] look[ed] back he was going to shoot [her]." She did as instructed.

When L.M. looked up, she was two blocks from home. She walked to a neighbor's house, the Crutchers', which was across the street from her home, so she could tell someone what happened. After she told them she had been raped, Mrs. Crutcher called the police. When the police arrived, they took her to the hospital. After leaving the hospital, she went to the police station and viewed a lineup. She identified defendant and codefendant. L.M. stated that codefendant looked the same but defendant did not because his head was now wrapped.

On cross-examination, L.M. said she had been to the Crutchers' home earlier and sat in a bedroom with Mrs. Crutcher's son.

L.M. described one defendant to the officers as slender, with long hair, and wearing a brown, quarter-length jacket, but she did not describe his pants. She did not remember telling the police she did not know what the offenders were wearing. L.M. could not recall if she told the officers about any conversations and could not remember if she told them her head was pushed to the floor. L.M. denied telling the police that immediately after she was pushed into the Blazer, a cap was placed on her head. She also did not recall telling the police defendant had taken $5. At trial, L.M. stated she did not "recall what I told the police. I don't think the police asked me as many questions as there are being asked here." Mildred Crutcher testified on behalf of L.M. Crutcher stated that at approximately 1:30 a.m. L.M. came to her door. According to Crutcher, L.M. was in a "bad condition" and crying. After approximately 15 minutes, Crutcher called the police. Because the police took a long time arriving, Crutcher and her son put L.M. in Crutcher's car. As they were leaving, the police arrived. Crutcher stated the police followed them to the hospital.

Crutcher testified she saw L.M. earlier that evening, approximately 45 minutes before L.M. arrived at the door crying. On cross-examination, Crutcher stated she first saw L.M. around 6 p.m. when L.M. came over. She saw her again around 11 p.m., at which time the two sat down and talked. Later in cross-examination, Crutcher stated she saw L.M. at 6 p.m. Crutcher stated she did not see L.M. again until 1:30 a.m. On redirect, Crutcher said she last saw L.M. 45

minutes before she arrived shaking and crying; she did not see L.M. but heard her speaking with her son. On re-cross, Crutcher stated she saw L.M. twice that evening, at 6 p.m. and 1 a.m., and heard her talking to her son on another occasion.

Officer Nosek testified that at approximately 1:45 a.m. he responded to a call of a sexual assault victim. When he arrived, he was met by Mrs. Crutcher. Crutcher took the officer and his partner into her home and said her neighbor had been raped. Nosek took her to the hospital.

On cross-examination, Nosek stated when he interviewed L.M. and asked her what the offenders were wearing, she said she did not know. Although L.M. described one offender as having long hair, Nosek did not put this information in his report. Nosek stated L.M. never described the sexual incident where she sat on top of defendant. Also, L.M. told Nosek that when she was abducted, the gun was pointed at her head, not her side. Nosek said L.M. did not tell him anyone threatened to shoot her nor did she mention she was robbed. When she described the incident, she never said her head was pushed to the floor. She did tell him a skull cap was pulled over her head when she was first pushed into the vehicle.

V.G.

V.G. testified that on November 19, 1992, she left her friend's home at approximately 2 a.m. As she was walking home, she noticed a Blazer with no headlights heading in her direction. The Blazer made a U-turn, passed her, and turned into a driveway which V.G. was about ready to cross. V.G. stopped because the Blazer was in her path. She then walked around behind the car, at which time defendant jumped out, put a gun to her head, and said, "bitch, get in the car." Defendant pushed her into the back of the Blazer, where she landed on the floor on her stomach. When she was pushed into the car, she saw another individual in the driver's seat.

The Blazer started moving and defendant asked V.G. if she had any money. She told him no. V.G. was still on the floor. She noticed a stick or something, picked it up and attempted to hit defendant but to no avail. Defendant pushed her head to the window, holding the gun to it. The gun went off and V.G. heard a ringing in her ear and became scared. When the gun went off, defendant stated, "bitch, you think I'm playing." V.G. responded no and asked defendant not to kill her. Defendant told V.G. to turn over onto her back and he unbuttoned her pants. His pants were unzipped and his penis out. V.G. noticed defendant had put on a hat which was pulled down over his eyes. Defendant kneeled over V.G. and stuck his penis in her mouth.

After it became erect, approximately five minutes, he took it out, and put it in her vagina. While defendant's penis was in her mouth, codefendant was holding the gun to her head. Defendant kept his penis in her vagina until he climaxed, which was about 10 minutes. Defendant told codefendant it was his turn. Defendant ordered V.G. to turn over onto her stomach.

The defendants switched places and defendant now had the gun to her head. Codefendant told V.G. to turn over and he stuck his penis in her mouth. Codefendant kept it there until it became erect, approximately five minutes, and then inserted it in her vagina. He kept it there for approximately five minutes until he ejaculated. When he finished, defendant told V.G. to turn over. Defendant told codefendant to check her for money. Codefendant did and told defendant she had none.

They drove for 5 to 10 minutes; V.G. was still on the floor. The car stopped and the door opened. Defendant stated, "bitch, bitch, come here, bitch." Defendant got back into the Blazer and said, "that bitch got way."

According to V.G., after defendant got back into the car, they drove around and a "police car kept on hitting, told him to stop and [codefendant] told [defendant], to ask him to stop the Blazer and he wouldn't stop." During this time, codefendant was holding the gun to V.G.'s head. The car eventually crashed. The police grabbed defendant and codefendant. The police took V.G. out of the Blazer and to the hospital. After leaving the hospital, V.G. was taken to the police station to view a lineup.

On cross-examination, V.G. said she was forced to perform oral sex on defendant, then vaginal sex, while codefendant held the gun to her head. Sometime later, she performed oral sex on codefendant and then vaginal sex, at which time defendant held the gun.

V.G. did not remember telling the police she was first forced to have sex outside the Blazer. She told the police she was grabbed outside the Blazer and did not say anything about sex outside the car. She denied telling the police she performed oral sex on defendant outside the vehicle. V.G. also denied telling the police she did not have oral sex with codefendant, only vaginal sex. She told the police about oral sex with codefendant and that defendant climaxed inside her.

Officer Giltmier testified on behalf of defendant. At approximately 3 a.m. on November 19, 1992, she was assigned to investigate an accident involving a Blazer. She observed defendants as they were taken from the car and then spoke with V.G. for 1 to 1$^1$/$_2$ hours. V.G. did not say what kind of sex she was forced to perform. From what

Giltmier believed, sex occurred outside the vehicle. She did not recall being told that V.G. was forced to perform oral sex inside the Blazer. She believed V.G. told her the sex with defendant occurred outside the vehicle. According to Giltmier, V.G. stated that after driving around for a short while, defendant forced her outside the vehicle, told her to turn around and bend over the Blazer. V.G. never told Giltmier that either defendant ejaculated inside her.

On cross-examination, Giltmier stated that when she arrived on the scene, V.G. was "quite visibly shaken, crying[,] very emotional. She was withdrawn *** very afraid, very frightened." V.G. was not able to give coherent answers. She took V.G. to the hospital and spoke with her after V.G. was examined, at which time V.G. was still upset. According to Giltmier, it was "extremely" difficult to get any information. V.G. told the officer defendant had performed sex while holding a gun to her head. She did not specify the type of sexual contact. V.G. also told Giltmier codefendant performed sex on her.

For reasons set forth later in this opinion, we remand the case for a new trial.

We first address defendant's proof beyond a reasonable doubt contention to protect his constitutional right against double jeopardy. (*People v. Champs* (1995), 273 Ill. App. 3d 502, 511, 652 N.E.2d 1184.) Although defendant sets forth two separate arguments on this issue, we find them related and treat them together. He argues that the stories of the complaining witnesses were completely inconsistent and varied each time they were told. In addition, the State presented no medical or physical evidence to support the victims' allegations or to connect defendant to the crime. Therefore, the State failed to prove him guilty beyond a reasonable doubt. This contention is without merit.

When presented with a challenge to the sufficiency of the evidence, a reviewing court, after viewing the evidence in a light most favorable to the State, must determine whether any rational trier of fact could find the essential elements of the charged offense beyond a reasonable doubt. (*People v. Wittenmyer* (1992), 151 Ill. 2d 175, 601 N.E.2d 735; *People v. Wrobel* (1994), 266 Ill. App. 3d 761, 641 N.E.2d 16.) The reviewing court is not permitted to substitute its judgment for that of the trier of fact on questions involving the weight of evidence and the credibility of witnesses. (*People v. Campbell* (1992), 146 Ill. 2d 363, 586 N.E.2d 1261.) Accordingly, we will not reverse unless the evidence presented at trial is so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Campbell*, 146 Ill. 2d at 375.

●1 Even though the testimony contains some inconsistencies, it

was the jury's province to weigh the credibility of the witnesses which it did against defendant. Based on the evidence present in the record, any rational jury could find the State proved the essential elements of the crimes charged beyond a reasonable doubt. Our determination, however, is not a "finding as to defendant's guilt or innocence that will be binding in a new trial." *People v. Champs*, 273 Ill. App. 3d at 511.

Defendant next argues he was denied his constitutional right to counsel of his choice. He relies on *People v. Little* (1990), 207 Ill. App. 3d 720, 566 N.E.2d 365, *People v. Washington* (1990), 195 Ill. App. 3d 520, 552 N.E.2d 1067, *People v. Green* (1969), 42 Ill. 2d 555, 248 N.E.2d 116, and *People v. Sullivan* (1977), 52 Ill. App. 3d 666, 367 N.E.2d 1042.

The State cites *People v. Burrell* (1992), 228 Ill. App. 3d 133, 592 N.E.2d 453, *People v. Jackson* (1991), 216 Ill. App. 3d 1, 574 N.E.2d 719, *People v. Phelps* (1990), 197 Ill. App. 3d 954, 557 N.E.2d 235, *People v. Lewis* (1988), 165 Ill. App. 3d 97, 518 N.E.2d 741, and *People v. Capers* (1989), 186 Ill. App. 3d 367, 542 N.E.2d 528, to support its position that the trial court did not err. The State failed to respond to or distinguish defendant's cases.

On the day the case was set for trial, private counsel appeared before the court asking to file an appearance on defendant's behalf. Counsel was not aware that trial was scheduled for that day and, therefore, was unprepared to begin trial. The trial court denied his request for a continuance, finding that there were no extraordinary grounds warranting a continuance at such a late date, particularly because the public defender had worked the case up diligently and all witnesses were present in court. The trial court did state, however, that it did not find defendant's request dilatory.

> "A defendant in a criminal case has a constitutional right to the assistance of counsel (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8), which 'includes the right to be represented by counsel of one's own choice.' (*People v. Green* (1969), 42 Ill. 2d 555, 557, 248 N.E.2d 116, 117; [citation].) The right to choice of counsel is an absolute right, limited only when abused, such as attempts to thwart, delay, or embarrass the effective administration of justice [citations] or when a conflict of interest might arise [citation]." (*People v. Young* (1990), 207 Ill. App. 3d 130, 133-34, 565 N.E.2d 309.)

Accordingly, the court must balance the right of a defendant to choose his or her counsel against the public need for efficient and effective administration of justice. *People v. Robinson* (1993), 254 Ill. App. 3d 906, 910, 626 N.E.2d 1242.

The granting of a continuance to substitute counsel rests within the sound discretion of the trial court and must be considered in light of defendant's diligence. (725 ILCS 5/114—4(e) (West 1992).) Whether a trial court's decision to deny a continuance violates defendant's right to be represented by counsel of his or her own choosing turns on the particular facts of each case. (*Robinson*, 254 Ill. App. 3d at 911.) Relevant factors include: defendant's request is a guise to "temporarily, thwart the administration of justice or to otherwise [embarrass or] impede the effective prosecution of a crime" (*People v. Jones* (1995), 269 Ill. App. 3d 925, 932, 647 N.E.2d 612); lack of evidence that new counsel is ready, willing, and able to take and proceed with the case; failure of defendant to articulate an acceptable reason for desiring new counsel; and representation of current counsel for a lengthy period of time prior to defendant's request for new counsel. (*Robinson*, 254 Ill. App. 3d at 911.) A court does not abuse its discretion where new counsel is unidentified or does not stand ready, willing, and able to make an unconditional entry of appearance on defendant's behalf. *Jones*, 269 Ill. App. 3d at 932.

We find the facts of this case closer to the cases cited by defendant than those cases cited by the State. The State's cases are easily distinguishable. In *Burrell*, the court found there was no evidence counsel was ready, willing, and able to take defendant's case particularly because the attorney was in court that morning, said nothing, and did not file an appearance. In *Jackson*, the court found defendant's request was a delay tactic and also found defendant failed to identify the new attorney. In *Phelps*, the court found defendant's request was a delay tactic, that defendant was out on bond, that the new attorney failed to contact the court, and that defendant's case was one of the oldest on the docket. In *Lewis*, the court found delay, defendant failed to show he was financially able to hire counsel, and there was no evidence defendant had secured new counsel. Finally, in *Capers*, the court found delay and that defendant only identified the attorney as being "expected" to appear, that members of the attorney's firm were present in court that day but no one spoke on defendant's behalf, and that defendant did not specifically identify retained private counsel who was ready, willing, and able to make an instant, unconditional entry of appearance.

Unlike *Jackson, Phelps, Lewis,* and *Capers,* the trial court in the instant case found that defendant's request was not a delay tactic. Similarly distinguishable from these cases and *Burrell* is the fact that counsel in the case *sub judice* was not only specifically identified but in fact appeared in court ready to represent defendant. In our case, defendant was not out on bond as in *Phelps* and defendant's

case was not yet a year old; hardly the same as the oldest case on the docket. Finally, there was no question about defendant's financial ability to hire counsel as in *Lewis*, because counsel had been retained and paid a fee.

*Little* and *Washington* are on point. In *Little*, the appellate court held that the trial court erred when it failed to grant defendant's request for substitution. Defendant argued that the court failed to make a proper inquiry and also did not find that his request was for delay purposes. The State argued that defendant's request came on the day of trial, that both parties were ready to proceed, all witnesses were present, the case had been pending for five months, defendant constantly demanded trial, and defendant demonstrated no prejudice. The appellate court found the case similar to *Washington* in that defendant had made no prior attempt to delay and had requested only a short continuance. In addition, the trial court failed to conduct the proper inquiry concerning retention of counsel. Defendant had been in custody for five months, he had never requested a continuance, and there was no evidence his request was to delay. Private counsel had been paid and although counsel was absent because he had not been given the correct date, his name was provided to the court. The court found that the interests of the State and the court were clearly outweighed by defendant's right.

In *Washington*, the appellate court also found that the trial court denied defendant his constitutional right to counsel of choice. On the day trial was scheduled, defendant requested a one-week continuance since he had retained private counsel. The request was denied. The appellate court found no evidence of any prior delay by defendant and defendant had requested none of the prior continuances. There was no evidence this was a delay tactic. The court had received a call from the attorney's secretary indicating his unavailability that day and defendant was incarcerated.

Moreover, in *People v. Young* (1990), 207 Ill. App. 3d 130, 565 N.E.2d 309, the appellate court held that the trial court abused its discretion in denying defendant's request for substitution of counsel. In *Young*, prior to jury selection, defendant stated that for the first time he was able to afford private counsel and had done so. After lunch, counsel appeared. The trial court denied counsel's request to appear. The appellate court reversed, finding that private counsel stood "*willing* and *able* to make an entry." (Emphasis in original.) (*Young*, 207 Ill. App. 3d at 134.) The court stated:

> "Unless the court specifically finds that defendant is utilizing his right to counsel to thwart the administration of justice, defendant's right to counsel of his choice ought to be respected. All that is

shown in this case is the potential for an *inconvenience* to the administration of justice; such an inconvenience cannot be deemed an *unreasonable* interference with the orderly process of judicial administration." (Emphasis in original.) (*Young*, 207 Ill. App. 3d at 135.)

In *Young*, defendant had not merely expressed a desire or expectation that counsel would appear as in *Capers*, nor was defendant's financial ability to hire counsel at issue as in *Lewis*.

■ In the case before us, trial had been set for September 13, 1993. However, because another trial went that day, defendant's case was continued to October 18, 1993. Defendant claims he did not know this was a scheduled trial day. On October 18, the court was advised defendant's family had retained private counsel. Counsel was present and ready, willing, and able to make an entry of appearance. However, counsel was not prepared to proceed to trial as defendant had not advised him trial was set for that day. The court, nonetheless, failed to ask counsel how long a continuance would be needed. Although the case was continued 14 times, none of these requests came from defendant and the case was not yet a year old. These factors parallel those in *Little*, *Washington*, and *Young*.

Based on the above, we find defendant's right to counsel outweighed the State's interest. At issue is not merely a trial court's discretion in whether to grant a continuance. At stake is defendant's constitutional right to be represented by counsel of choice. The right is absolute and limited only where abuse exists such as attempts to thwart justice, delay, or embarrass the effective administration of justice, or where a conflict of interest is clear from the record. Also, because the issue is right to counsel of choice, we reject the State's contention that a showing of prejudice is necessary.

Because we remand, we do not address defendant's other issues.

Reversed and remanded.

ZWICK, J., concurs.

JUSTICE EGAN, dissenting:

This case is one more of too many such cases: An 11th hour and 59th minute request by a defendant for substitution of attorneys *and* an attendant, and more important, request for a continuance. Certain facts appear in almost all of them: A serious offense; a strong case for the prosecution; a defendant who is no stranger to the criminal justice system; and an *oral* motion for substitution made on the day of trial. This case fits the pattern: Overwhelming evidence of shocking and

disgusting crimes committed by the defendant, who had previously been convicted of the murder of a four-year-old child in 1978 and had been sentenced to 20 years in the penitentiary; and an oral motion for substitution on the day of trial.

The defendant and a codefendant were present on September 13, 1993, when the case was continued until October 18, 1993. A private attorney filed his appearance on behalf of the codefendant on September 13. Colloquy ensued in which the trial judge made it clear that he was allowing a substitution of attorney on behalf of the codefendant with the understanding that the case would go to trial on October 18. The assistant public defender who represented the defendant told the judge, "On behalf of Mr. Childress, we'll go by agreement. *We are ready.*" (Emphasis added.) The judge then continued the case until October 18. He again made it clear that the case would go to trial on that date. On October 18, it was the judge who initiated the inquiry about a possible substitution by questioning the defendant. He asked the defendant if he had told the new attorney that his case was scheduled for trial and the defendant said, "Well, I didn't understand that it was set for trial today myself, Your Honor." The judge made remarks later that obviously show that he did not believe the defendant. He said, "You knew well that this case was set for trial." He also said that the defendant had misled his lawyer and "was disingenuous as far as [the judge was] concerned." Those conclusions by the judge are amply supported by the record. During the colloquy, the assistant public defender told the judge that the defendant had told him three weeks before that he had hired a private attorney.

The granting of a continuance rests within the discretion of the trial judge. Among the factors to be considered in the exercise of that discretion are whether the defendant has shown diligence (*People v. West* (1990), 137 Ill. 2d 558, 560 N.E.2d 594); the failure of the defendant to articulate an acceptable reason for desiring new counsel when he was already represented by an experienced court-appointed criminal lawyer (*People v. Jackson* (1991), 216 Ill. App. 3d 1, 574 N.E.2d 719); and the representation by current counsel for a lengthy period prior to the request for new counsel (*People v. Bodoh* (1990), 200 Ill. App. 3d 415, 558 N.E.2d 178). The defendant has not shown diligence; during the 11 months the case was pending, the defendant never expressed any dissatisfaction with the assistant public defender who had represented him for a considerable amount of time and who answered ready for trial on September 13; and he failed to articulate *any reason* for desiring new counsel.

The case had been continued by agreement 14 times. I refuse to accept the claim that the responsibility for those continuances may

not in any way be attributed to the defendant. Insofar as the record is concerned, every single one of them could just as easily have been acquiescence on the part of the State to requests of the defendant.

The three cases relied upon by the majority, *Little*, *Washington* and *Young*, cite *People v. Green* (1969), 42 Ill. 2d 555, 248 N.E.2d 116, in support of their reversals. In *Green*, the defendant was arrested on May 17, 1968, and charged with petty theft. On July 2, 1968, the second trial date, the defendant appeared *without an attorney* and requested a continuance. He represented that his lawyer was in Washington and had been paid by his church. The judge then appointed a public defender and compelled the defendant to go to trial *that day*. As is obvious, the facts of *People v. Green* are far removed from the facts of those cases, and they certainly are far removed from the facts of this case. In any event, *Washington*, *Little* and *Young* are distinguishable.

In *Washington*, the public defender told the judge that the defendant had informed him that his family had retained an attorney who asked that the case be continued for seven days. The judge denied the motion without making any further inquiry. The appellate court reversed and emphasized the fact that the trial court "failed to conduct any inquiry into the stated reason for the request for the continuance when it summarily denied the request." (*Washington*, 195 Ill. App. 3d at 525.) In *Little*, which relied on *Washington*, the court pointed out that the trial judge "conducted no inquiry into the truth or falsity of the assertions by defendant or the public defender," and the court stressed the fact that the trial judge erroneously concluded that he could not grant a continuance because the defendant had previously demanded trial. (*Little*, 207 Ill. App. 3d at 727.) I point out that neither *Washington* nor *Little* involved a codefendant. In *Young*, there was a codefendant whose lawyer objected to any continuance. But the court, in reversing the conviction, emphasized the fact that the trial judge never determined whether the substituting attorney was prepared to go to trial. *Young*, 207 Ill. App. 3d at 134.

In sharp contrast to those cases, the trial judge here made a conscientious attempt to determine the facts. In sharp contrast to those cases, the trial judge here had a defendant who not only attempted to mislead the judge but did mislead the substituting lawyer. Before leaving this point, I wish to make it clear that in my judgment the substituting lawyer, who had been retained three weeks before, had the obligation at least to contact the assistant public defender who was then representing the defendant in order to ascertain the facts. And there was nothing to prevent him from filing a written motion weeks before October 18 asking for a continuance.

During the hearing, the substituting lawyer, who said he was not able to proceed that day but never said how much time he would need, indicated a willingness to proceed as co-counsel with the assistant public defender, but the assistant public defender stated that that would be contrary to office policy. The judge then said that the substituting lawyer would not be permitted to file an appearance. The substituting lawyer then asked if the judge was finding that the request for continuance was "primarily for the purpose of delay," and the judge said, "Not necessarily." He added some remarks. The substituting lawyer again asked the judge if he was finding that the defendant was requesting a continuance "primarily for the purpose of delay," and the judge again said, "Not necessarily." The judge again made additional remarks.

The defendant's lawyer on appeal, who is the substituting lawyer, has now seized on those answers by the judge as proof that the motion for continuance was not made for the purpose of delay. I believe that the judge's answers were equivocal, and I point out that the judge did make a finding that "the interest of justice" required that the case go to trial that day; he also said that he did not feel that a "continuance at this juncture is just." At this point, I must express a respectful refusal to accept the general language quoted by the majority from *People v. Young* that "[u]nless the court specifically finds that defendant is utilizing his right to counsel to thwart the administration of justice, defendant's right to counsel of his choice ought to be respected." (*Young*, 207 Ill. App. 3d at 135.) No citation is made to support such an all-encompassing pronouncement; and my research has found none, certainly none from the supreme court. But if there is such a requirement, I believe the judge's findings satisfy it.

Another fact in the record should be noted. There was another lawyer representing the codefendant who was prepared to go to trial on October 18. The trial judge called another judge a few days before October 18 and requested that the codefendant's lawyer not be held to trial before her to enable him to go to trial on October 18. The plans of the other lawyer, of course, the right of his client to a quick trial and the efforts of the trial judge and the accommodation by another judge are all to be held for naught because of the desires of an undiligent and untruthful defendant. It has been said that the right to be represented by counsel of one's own choosing "may not be employed as a weapon to indefinitely thwart the administration of justice or to otherwise embarrass the effective prosecution of crime." (*People v. Friedman* (1980), 79 Ill. 2d 341, 349, 403 N.E.2d 229.) In my judgment, regardless of how charitably the trial judge may have characterized the motion to substitute, the result sought by the de-

fendant would embarrass the effective prosecution of crime. The trial judge pithily said it all when he said that the granting of a continuance would not be "just." He exercised his discretion after careful consideration, and that discretion was not abused.

For these reasons, I dissent.