# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Graham*, 2012 IL App (1st) 102351

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD GRAHAM, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-10-2351 |
| Filed | May 14, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's amended postconviction petition alleging that he was denied his right to counsel of choice and that his trial counsel was ineffective in his prosecution for first-degree murder was properly dismissed at the second stage of the proceedings, notwithstanding the facts that his trial counsel had a pending case before the Attorney Registration and Disciplinary Commission and that he failed to consult a forensic expert, since defendant failed to make a substantial showing that he was denied his choice of counsel or that he was prejudiced by his counsel's failure to consult and call a forensic expert at trial. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 96-CR-32393; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Anne E. Carlson, and Justyna Garbaczewska Scalpone, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Presiding Justice Hoffman and Justice Karnezis concurred in the judgment and opinion.

## OPINION

¶ 1    A jury convicted petitioner, Edward Graham, of three counts of first-degree murder. The trial court imposed the death penalty, which later was commuted to a term of natural life in prison without the possibility of parole. Petitioner now appeals the second-stage dismissal of his amended postconviction petition. Petitioner contends the postconviction court erred in dismissing his amended postconviction petition because he made a substantial showing: (1) he was denied his sixth amendment right to counsel of choice at trial; and (2) his trial counsel provided ineffective assistance. We affirm.

¶ 2    On the first day of trial, June 2, 1998, prior to jury selection, Judge Mary Maxwell Thomas (hereinafter referred to as the trial court or the trial judge) engaged in a colloquy with the assistant State's Attorney, defense counsel, and petitioner regarding petitioner's choice of counsel. As the colloquy is instrumental to our holding that the trial court did not deprive petitioner of his counsel of choice, we quote the colloquy in detail:

"MR. HOWARD [defense attorney]: Early on in this case, when it became publicized that there was an ongoing fight between the ARDC and me relative to some matters that happened years ago, a complaint pending with the ARDC we've been fighting about, I stood before this court, the matter was mentioned and we had [petitioner] in front of the court early on. We talked about it in front of the court. I explained to the court that while there was an ongoing fight between the ARDC and me, it has not disturbed or caused me any problems with my representing clients.

I went on to say further I have been practicing law for 37 years and if I stopped today it would be of no concern to me.

But the State for whatever reason has seen fit to bring that issue up again and maybe it's because of the *** importance of this case and they wanted it aired again. I have mentioned it again to my client and reminded him that I do have that ongoing fight and

-2-

I assured this court that my licenses are intact and my conscience is intact and I have no problem with representing anybody and certainly being able to represent [petitioner]. But they wanted it spread of record again and so I'm doing that.

THE COURT: Anything else from the State to say on that issue?

* * *

MR. OSTROWSKI [Assistant State's Attorney]: Your Honor, *** we do think it should be spread of record because in any proceeding and trial such as this, as you know, the defendant's rights are at issue. We want him to be fully aware that the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois has initiated a disciplinary proceeding against Mr. Howard. It's currently pending and it did charge Mr. Howard with professional misconduct including allegations that he engaged in the unauthorized practice of law during the period of a suspension, so we, your Honor, do think that it's important. We do have the utmost respect for Mr. Howard, we do agree with the fact his license is currently intact, but we do believe these are things that the defendant should be aware of before he proceeds further with trial.

* * *

THE COURT: [Petitioner], you're aware of this, is that right?

PETITIONER: Yes.

THE COURT: Do you have any problems at all going forward with Mr. Howard on that account at this time?

PETITIONER: Well, no embarrassment to Mr. Howard, but this case is involving my life, and *** I'm questioning his ways of, you know, coming to me asking me certain things about the case. And I have been locked up 18 months. I probably seen him three times since I have been here and for the last six to eight months, you know. I really had no time to talk to him about the case and now we standing in front of the judge ready to go forward with the trial and you know, I spoke to him yesterday and I just briefly spoke to him about this pending thing, but it's–well, in jail, I get a little clippings about it and I questioned him once and he said no, you know, that's really nothing. But then I sit back and I say well, you know, this is my life that is on the line. I know he goes home and you know, but I'm locked up and I don't have no–I have somewhat a doubt about it, but I'm so far into the case.

THE COURT: Wait. *** Is your doubt as to whether his license is intact or your doubt concerning his professional capabilities?

PETITIONER: His professional capability.

* * *

MR. HOWARD: It's a serious matter. I told [petitioner], and I thought we had this straight in the back, we did go through all of this. *** And I don't want any client, [petitioner] or any other man, any other person to have me representing him if there is one iota of question about my ability to do so, and because [petitioner's] life is on the line. He ought to have a lawyer that he has absolutely no reservations about and if he has the slightest reservations about the manner in which I'm handling his case *** [then] we

-3-

got a problem with it.

THE COURT: Let me say this. Certainly I have every confidence in all of the lawyers that are involved in this case. The utmost standards and highly qualified, skilled attorneys in this case. Mr. Howard's reputation I maybe even say is legendary, I mean about the country. I don't have any reservations, but it's not an issue about whether I have any reservation, the issue is whether or not you have any reservations. Let's go off the record for one minute.

(Off-the-record).

THE COURT: All right. We had a discussion off the record where I indicated to [petitioner], part of it on the record, I believe, about my confidence in the lawyers who are involved in this trial. But I said to him my feelings aren't important, what is important are his feelings and he said some things that I think that we should place of record because I specifically did ask him off the record whether he had a problem with Mr. Howard's, the ARDC matter, but more concerned about Mr. Howard's ability to represent him, and your answer now after having discussed this further off the record, [petitioner], is what, how do you feel about Mr. Howard and his ability to represent you?

PETITIONER: I feel he's very capable of representing me.

THE COURT: Do you have any doubts at all about his ability to go forward and represent you in this case at this point?

PETITIONER: No.

THE COURT: And are you ready to go forward at this time?

PETITIONER: Yes.

* * *

THE COURT: The bottom line, [petitioner], are you satisfied that Mr. Howard is going to represent you to the best of his ability and he's capable of doing that and are you comfortable with going forward with that?

PETITIONER: Yes, I am.

THE COURT: Anybody have anything else on that before we close this and move on?

MR. HOWARD: I would like to ask one question since we're talking. Are you under the impression that the fact that ARDC and I are fighting about a technical matter, are you feeling I'm disturbed by that to the extent it would affect my ability to represent you?

PETITIONER: No. I wouldn't know that. I wouldn't know that.

MR. HOWARD: You know about it and I want to know from you, because I'm telling you that it does not affect me, but if you feel that it does, I don't want to represent you.

PETITIONER: By me standing here and listening to you reply to the State's Attorney, I know it don't and the way the judge explained to have confidence in you, where am I to doubt you.

* * *

-4-

MR. HOWARD: *** Well, anyway, I just want you to be certain.

PETITIONER: I'm certain.

THE COURT: You are certain?

PETITIONER: I'm certain."

¶ 3    Mr. Howard continued to represent petitioner at trial.

¶ 4    Testimony at trial established the following facts.

¶ 5    In the mid-1980s, petitioner met Johnny Jones, Sr. (Senior), a major Chicago cocaine distributor, while doing carpentry work for him. For approximately five years, petitioner delivered cocaine to street dealers affiliated with Senior, collected drug-sale proceeds from them, and returned the money to Senior. In return, petitioner received $10,000 per month for his courier services.

¶ 6    Senior lived in a house with Marshall Mason. Erica Chotoosingh occasionally spent nights at his house. Occasionally, Senior's oldest son, Johnny Jones, Jr. (Junior), and his friend, Cory Williams, spent the night at Senior's house in second-floor bedrooms. On September 28, 1996, Junior and Mr. Williams were at Senior's house and went upstairs to sleep at approximately 1 a.m. About an hour later, Junior awoke to a loud thump and heard the sound of gunfire. Junior determined that Mr. Williams was unhurt, and together they went down the staircase to the main floor. Junior testified he saw petitioner shooting a handgun "in the kitchen area" into Mr. Mason's bedroom. Junior saw petitioner fire two or three shots. Junior and Mr. Williams ran upstairs to get a cell phone to call the police and then returned to the staircase. As Junior walked down the stairs, he heard a girl scream and more gunshots. When he got to the bottom of the staircase, Junior saw petitioner inside Senior's room with a handgun. Petitioner shot two or three times into the left side of the bedroom while crouched down under the bed. Petitioner fired another shot into Mr. Mason's room, grabbed a white box, and ran out the back door of the house. Junior locked the door and went into the kitchen, where he met Mr. Williams. Junior then went into Senior's room and saw Ms. Chotoosingh lying underneath the bed. Then he went into the kitchen and saw Senior and Mr. Mason lying on the floor of Mr. Mason's room. Senior was lying on his stomach, and his body was toward the door, facing a dresser. Mr. Mason was lying on his back beside the bed. Junior told Mr. Williams that petitioner was the shooter; specifically, he told Mr. Williams "man, it was Ed, man, it was Ed."

¶ 7    Mr. Williams testified he did not see the shooting, but only heard shots fired. He did see a person leave through the back door, but he did not get a good look at him and did not know the identity of that person. Several times during the shooting, Junior told him that the shooter was petitioner. As the shooting was happening, Mr. Williams attempted to call the police from a cell phone, but was unable to get through. Finally, after the shooter left, Junior and Mr. Williams called the police from the home phone in the kitchen. The police arrived four or five minutes later.

¶ 8    John Butler, a forensic investigator, testified the police found the bodies of Senior and Mr. Mason on the floor of Mr. Mason's bedroom. Senior's body was lying in an east-west direction. Mr. Mason's body was lying in a north-south direction. Ms. Chotoosingh's body was discovered in the master bedroom, underneath the bed.

¶ 9    Mr. Butler testified he recovered one spent cartridge casing near the closet on the north side of the master bedroom, and four spent cartridge casings and two fired bullets under the bed on the west side of the master bedroom, next to Ms. Chotoosingh's body. Mr. Butler also found a metal jacket of a bullet on a black chair in the master bedroom, a fired bullet next to Senior's body in Mr. Mason's bedroom, a fired bullet in the wall next to the rear kitchen door, a fired bullet underneath the kitchen table, and another bullet on the carpet in the rear hallway.

¶ 10    Larry Simms, a medical examiner, performed the autopsy on all three victims. Mr. Simms testified that Senior, Mr. Mason, and Ms. Chotoosingh each died from multiple gunshot wounds and that the manner of their deaths was homicide.

¶ 11    Walter J. Kryszak, a firearms examiner, testified all of the spent cartridge casings and fired bullets recovered at the crime scene and by Mr. Simms during the autopsy were from a .380-automatic weapon except for a .40-caliber bullet found in Ms. Chotoosingh's lower back, which was from an old injury.

¶ 12    Detective George Karl testified that after Junior identified petitioner as the shooter to the police on September 28, 1996, the detectives began looking for petitioner. When they were unable to locate him for three weeks, they suspected he had left town. Detective Karl learned that petitioner had an ex-girlfriend named Yolanda Harris and a son who lived in Las Vegas. Detective Karl contacted FBI agents from the fugitive section in Las Vegas, who set up a surveillance of Ms. Harris.

¶ 13    On November 5, 1996, FBI agents followed Ms. Harris to a motel where petitioner was staying. After Ms. Harris left the motel in the early morning hours of November 6, the FBI arrested petitioner. He had $851 on his person. In his room they found $103,806 under one dresser, $10,000 underneath another dresser, and various newly bought home appliances. Chicago police took custody of him on November 11, 1996.

¶ 14    Assistant State's Attorney (ASA) Mike Rogers spoke with petitioner on November 11, 1996. ASA Rogers testified that petitioner stated he arrived at Senior's house in the early morning hours on September 28, 1996, smelled gunpowder, saw smoke, found three people dead, and left. Petitioner also acknowledged that he saw Junior in the house prior to leaving. ASA Rogers told petitioner that Junior was accusing him of being the shooter. Petitioner then invoked his right to silence.

¶ 15    Rocky Albe, a Las Vegas police officer who was detailed to the FBI in September 1996, testified that on November 13, 1996, the FBI received a phone call from Carl Torrence. Mr. Torrence was an inmate who had been incarcerated with petitioner in Las Vegas. Mr. Torrence stated that petitioner told him $200,000 was in a mini storage unit in Las Vegas under the name of Yolanda Harris or her sister, Kimberly Polk.

¶ 16    The FBI searched for mini storage units in the vicinity of Ms. Harris's apartment and found one registered under Kimberly Polk. In the storage unit, the FBI found some clothes, a seat from a minivan, and a safe that was empty except for a large quantity of rubber bands.

¶ 17    On November 26, 1996, the FBI again spoke with Mr. Torrence in the Las Vegas jail. Mr. Torrence was being held on narcotics charges at the time. He subsequently received probation in his drug case in exchange for his testimony against petitioner.

¶ 18    Mr. Torrence testified he met petitioner while they both were in jail in Las Vegas. Mr. Torrence asked petitioner about his charges, and petitioner stated he was involved in a murder in Chicago. Petitioner further told Mr. Torrence that he went to his friend Senior's house early one morning to drop off money. Inside the house, he smelled and saw gun smoke and found Senior dead. Petitioner stated he left to shuttle drugs to another location, but came back later and saw Senior's son standing on the stairs. Petitioner left immediately.

¶ 19    Mr. Torrence testified he spoke to petitioner the next evening. Petitioner told him he was considering telling the police about his participation in the drug ring and asking them to put him in a witness protection program. Mr. Torrence advised him not to do so, saying he would expose himself to drug conspiracy charges. Mr. Torrence pressed petitioner to "come clean" to him about the murder.

¶ 20    Mr. Torrence testified that petitioner told him he was stealing money from Senior in order to support a drug habit. Senior found out, became angry, started to send petitioner to dangerous places to drop off drugs, and in general was not treating him the same way he had in the past. Two days before the murder, Senior ordered petitioner to bring him boxes containing $750,000. Petitioner did not have $750,000, so he paid a man named Irving $15,000 to kill Senior, but Irving failed to do so. On the night of the murder, petitioner placed a 9-millimeter handgun in a box and went to Senior's house. Once there, he shot Senior twice and shot another man who was there twice. Petitioner heard Senior yell, "Baby get the gun," so he went to look for "the lady that was in the house." He found her in the other bedroom under the bed, and shot her a total of five times. After making sure all three people were dead, he picked up some of the gun casings, grabbed the box he had brought with him, and left the house. On his way out, he saw Senior's 19-year-old son standing at the bottom of the stairs.

¶ 21    Mr. Torrence testified petitioner further told him that, after leaving Senior's house, he took his gun apart and discarded all the parts in a garbage can and in different sewers. Then he went to Las Vegas with a large amount of money. Petitioner told Mr. Torrence that when he was arrested by the FBI, he had $100,000 on him, he had placed $200,000 in a storage unit, and had placed $300,000 somewhere else.

¶ 22    Mr. Torrence testified he had a third conversation with petitioner early the next morning, in which petitioner mentioned having a .380 handgun that he had broken apart and thrown away and wondered whether the police could trace it back to him.

¶ 23    Petitioner testified in his own behalf and told a story consistent with the story he told in his first conversation with Mr. Torrence. Petitioner testified that on September 28, 1996, at approximately 3:10 a.m., he went to Senior's house to deliver some money when he noticed the garage door was open. Petitioner backed the car into the garage and closed the door. As he walked into the house, he smelled gunsmoke. Petitioner went into the dining room and put the box with the money on the table. He noticed Senior on the floor by Mr. Mason's room. Petitioner drew his 9-millimeter gun, looked into Mr. Mason's room again, and saw a "head down on the floor." The head "looked like" Mr. Mason. Petitioner walked to the master bedroom (belonging to Senior) and looked in the bathroom because there was a light on, but he did not see anyone there. Petitioner proceeded to the front of the house, where he

saw Junior. Petitioner grabbed the money box and went outside. Petitioner testified he took the money box because Senior previously had told him "if anything ever happened, grab the money and make sure no money or drugs were in the house." Petitioner dropped the money off in a garage, went home and recalled an argument Senior had with a man named Keith Sweat. Petitioner stated that Mr. Sweat was one of the main dealers that they supplied. Petitioner testified Mr. Sweat owed Senior over $1 million, that Senior and Mr. Sweat had argued over the money, and that Mr. Sweat threatened to do something "unpleasant" to Senior.

¶ 24    Petitioner testified he later went to an airport outside of Chicago and flew to Indianapolis and then to Las Vegas. He admitted he did not use his own name. Petitioner testified his son's mother, Yolanda Harris, and his son lived in Las Vegas. After arriving in Las Vegas, petitioner gave Ms. Harris $9,500 for the purchase of a new truck, and he gave her another $8,000 so she could take care of some bills that were overdue. Petitioner also testified he gave Ms. Harris $30,000; Detective Karl testified he recovered the $30,000 from Ms. Harris after she flew into Chicago on November 6, 1996. Petitioner testified he flew to Las Vegas not because he was afraid of police, but because he feared Keith Sweat. Petitioner denied shooting Senior, Mr. Mason, and Ms. Chotoosingh.

¶ 25    The jury convicted petitioner of three counts of first-degree murder. Petitioner waived a sentencing-phase jury. The trial court found petitioner eligible for the death penalty. After hearing evidence in aggravation and mitigation, the trial court sentenced petitioner to death.

¶ 26    Petitioner appealed directly to the supreme court. *People v. Graham*, 206 Ill. 2d 465 (2003). He raised several allegations of error, including: (1) Mr. Howard labored under a conflict of interest because he previously represented Junior when he went to the police station on the night of the murders at the request of Junior's uncle after Junior had been taken there for questioning; (2) he was denied a fair trial because, on direct examination by the State, the assistant State's Attorney testified about petitioner's invocation of his right to remain silent, and, in closing arguments, the State again mentioned petitioner's postarrest silence; and (3) Mr. Howard provided ineffective assistance of counsel when he did not object to the State's improperly eliciting Junior's prior consistent statement. *Id*. at 470, 474, 478. The supreme court affirmed petitioner's convictions, holding that Mr. Howard did not have an attorney-client relationship with Junior, that petitioner forfeited review of the assistant State's Attorney's testimony and the comments regarding his postarrest silence, and that petitioner received effective assistance of counsel because Mr. Howard's performance did not fall below an objective standard of reasonableness and petitioner failed to show he suffered prejudice. *Id*. at 474, 475, 477, 479. Petitioner also raised several sentencing-phase issues, but the supreme court noted that while the appeal was pending, the Governor had commuted petitioner's death sentence to natural life imprisonment without the possibility of parole or mandatory supervised release. *Id*. at 470. The supreme court held that the commutation rendered petitioner's sentencing-phase issues moot. *Id*.

¶ 27    On December 10, 2008, petitioner filed his amended petition for postconviction relief. In his amended petition, petitioner alleged he was denied his sixth amendment right to counsel of choice when he was misinformed on the first day of trial regarding the extent of the disciplinary proceedings in which Mr. Howard was involved at the time he represented

petitioner, and when the trial court coerced him into keeping Mr. Howard as his attorney. Petitioner also alleged he was denied the effective assistance of counsel when Mr. Howard failed to consult a forensic expert, where such expert, if hired, would have testified that the physical evidence found at the crime scene contradicted Junior's testimony.

¶ 28    In support of his petition, petitioner attached 22 supplemental volumes of common law record relating to ARDC proceedings against Mr. Howard prior to, during, and after Mr. Howard's representation of petitioner. Petitioner also attached his own affidavit in which he claimed he was not provided with all the information regarding Mr. Howard's ARDC proceedings. Petitioner further stated in his affidavit that the reason he kept Mr. Howard as his attorney was because the nature of the ARDC proceedings was not fully explained to him and because the trial judge "pushed [him] to continue with Mr. Howard as [his] lawyer, by assuring [him], both on and off the record, that Howard was a wonderful attorney." Also, petitioner attached the affidavit of Mr. Howard, in which he stated he did not remember any specific conversations he may have had with petitioner regarding the specifics of the ARDC proceedings and he admitted he did not consult with a forensic expert to have the crime scene evidence examined. Finally, petitioner attached an unnotarized "declaration" of Kenneth Moses, the director of Forensic Identification Services in San Francisco, California, in which he stated that Junior's testimony regarding petitioner's location at the time he fired shots toward the bed under which Ms. Chotoosingh was hiding was not supported by the physical evidence.

¶ 29    The State filed a motion to dismiss. Following arguments on the motion, Judge Maura Slattery Boyle (hereinafter referred to as the postconviction court) dismissed petitioner's amended postconviction petition. The postconviction court found that petitioner was informed of Mr. Howard's pending ARDC matters on the first day of trial and that the trial judge did not unduly influence petitioner to keep Mr. Howard as his attorney. The postconviction court further ruled that Mr. Howard was not ineffective for failing to retain a forensic expert, as such a decision was a strategic choice and not prejudicial, given the evidence presented against petitioner at trial. Petitioner filed this timely appeal from the second-stage dismissal of his amended postconviction petition.

¶ 30    A postconviction proceeding "is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). Such a proceeding "allow[s] inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). "Thus, issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are considered waived." *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002).

¶ 31    At the second stage of postconviction proceedings, the State may file a motion to dismiss the petition and the postconviction court must determine whether the petition and any accompanying documents make a substantial showing of a constitutional violation. *People v. Hodges*, 234 Ill. 2d 1, 11 n.3 (2009). The postconviction court takes "all well-pleaded facts that are not positively rebutted by the trial record" as true. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If the petition fails to make a substantial showing of a constitutional

violation, it is dismissed; if such a showing is made, the petition advances to the third stage, where the postconviction court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2010). A second-stage dismissal of a postconviction petition is reviewed *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 389 (1998).

¶ 32     First, petitioner contends the postconviction court erred in dismissing his amended postconviction petition because he made a substantial showing he was denied his sixth amendment right to counsel of choice at trial. The sixth amendment guarantees that, in all criminal prosecutions, the accused shall have the right to assistance of counsel (U.S. Const., amend. VI), which includes the right to counsel of his choosing. *People v. Bingham*, 364 Ill. App. 3d 642, 645 (2006). The right to counsel of choice is distinct from the right to effective representation of counsel. *Id*. at 648. The right to counsel of choice exists for its own sake and is protected independent of concerns regarding the fairness of the proceedings. *Id*. at 647. Therefore, the inquiry is whether petitioner was prevented from being represented by counsel of his own choosing, and not the quality of representation he actually received at trial. See *People v. Childress*, 276 Ill. App. 3d 402, 413 (1995) (holding that a showing of prejudice is not necessary to establish a violation of the right to counsel of choice).

¶ 33     Petitioner argues he made a substantial showing he was denied his sixth amendment right to counsel of choice when the State and his defense counsel, Mr. Howard, misinformed him on the first day of trial about the extent of Mr. Howard's pending disciplinary problems. Specifically, petitioner argues that at the time of his representation, Mr. Howard was dealing with four different disciplinary proceedings initiated against him by the ARDC, none of which was fully explained to him: (1) he was on probation instituted by the ARDC in 1992 for neglecting legal claims of various clients, converting client funds, failing to promptly return unearned fees, and making false statements to his clients; (2) the ARDC charged him in July 1997 with violating the above probation; (3) the ARDC filed a new complaint against him in June 1997; and (4) he was being investigated with respect to the mishandling of two other clients, which led to another formal complaint being filed in 1999, after the conclusion of petitioner's trial.

¶ 34     Petitioner contends that the probation required Mr. Howard to comply with "onerous tasks" while representing petitioner in the capital proceedings, none of which was explained to him on the first day of trial. Mr. Howard was obligated to participate in a law office management program, report to an administrator regarding his progress in setting up the program, cooperate with the administrator regarding any investigation of his conduct, regularly meet with an ARDC officer, and make restitution payments to his clients as well as reimburse the ARDC for the costs of the proceedings. Petitioner contends Mr. Howard failed to cooperate with the administrator and to meet regularly with the ARDC officer, which led the Illinois Supreme Court to issue a rule to show cause why his probation should not be revoked.

¶ 35     Petitioner contends the 1997 complaint filed by the ARDC, which was not explained to him on the first day of trial, alleged that Mr. Howard: (1) made false statements in a petition to appear *pro hac vice* in the United States District Court for the District of Alaska by denying he had previously been suspended from practicing in federal court; (2) neglected a client's appeal and failed to promptly refund an unearned fee of $20,000; and (3) engaged

in the unauthorized practice of law on behalf of three clients during his period of suspension pursuant to the 1992 ARDC matter. On February 4, 1998, while petitioner's case was still in pretrial stages, the ARDC Hearing Board found Mr. Howard guilty of the misconduct charged in the 1997 complaint and recommended a two-year suspension.[1]

¶ 36 Petitioner argues "[o]f all of the above disciplinary matters, [he] was informed only of the unauthorized practice of law allegation contained in the 1997 complaint. Thus, the statements to [petitioner] on the first day of trial that Howard had only been charged with, rather than found to have committed the unauthorized practice of law, and that this charge was just a 'technicality' were simply inaccurate. Howard was not simply having a disagreement with the ARDC over possibly representing a few clients while his license was suspended. The Hearing Board had already found by clear and convincing evidence that he had committed this misconduct, had neglected another client's appeal and had filed a false petition in a federal court. In addition, Howard was on rigorous probation which he had violated, and was facing a two-year suspension from practicing law, while simultaneously being required to pay thousands of dollars in restitution."

¶ 37 Petitioner argues that Mr. Howard, the State, and the trial court combined to deprive him of his sixth amendment right to counsel of choice by failing to ensure the accuracy of the information conveyed to him regarding the extent of Mr. Howard's disciplinary problems. Implicit in petitioner's argument for reversal of the trial court is the premise that, once information regarding disciplinary proceedings against defense counsel is relayed to petitioner in open court, the trial court must inform itself of the details of all such disciplinary proceedings against defense counsel and then ensure that petitioner is fully apprised thereof. We addressed a similar argument in *People v. Perry*, 183 Ill. App. 3d 534 (1989), where the defendant there contended that the record failed to show he was fully apprised of all the disciplinary proceedings against his attorney. *Id*. at 540. The defendant argued that the trial judge was obliged to insure that a defendant is aware of all the details of his counsel's disciplinary problems. *Id*. We disagreed, noting that such an obligation would run counter to Supreme Court Rule 766 then in effect (Ill. S. Ct. R. 766 (eff. July 1, 1984)), which provided for the confidentiality of the majority of disciplinary proceedings. We held that "to carry the premise to its logical conclusion, if we say such an obligation is imposed on a judge, the same obligation should be imposed on the judge who learns that a lawyer has health, monetary or domestic problems or is under criminal investigation. The lot of the beleaguered criminal trial judge is already not a happy one; and we are confident that no reviewing court would saddle him further with the onerous duty now suggested by the defendant." *Perry*, 183 Ill. App. 3d at 540.

¶ 38 Supreme Court Rule 766 has since been amended (Ill. S. Ct. R. 766 (eff. June 14, 2006)), but it continues to provide for the confidentiality of certain disciplinary proceedings, and, as such, runs counter to petitioner's argument that where a defense counsel's particular disciplinary problem is addressed on the record, the trial court is obliged in all instances to

---

[1]Mr. Howard appealed the two-year suspension, and he was not on suspension at the time he represented petitioner.

make itself aware of and to reveal the details of *all* disciplinary proceedings against defense counsel. As in *Perry*, we decline to impose such an obligation on the trial judge.

¶ 39    The cases cited by petitioner, *Bingham*, *Childress*, and *St. Pierre v. Cowan*, 217 F.3d 939 (7th Cir. 2000), do not compel a different conclusion here. In *Bingham*, the defendant requested a continuance on the day his trial was set to begin because he wanted to be represented by a specific attorney who was representing him in other pending cases. *Bingham*, 364 Ill. App. 3d at 644. The named attorney had contacted the assistant State's Attorney the previous day. *Id*. The trial court denied the defendant's motion for a continuance to obtain new counsel. *Id*. We reversed and remanded for a new trial, holding that the trial court deprived the defendant of his sixth amendment right to counsel of choice by denying his motion for a continuance, where the case had been pending only three months and no prior continuances had been filed. *Id*. at 645. We held that the trial court should have inquired into the circumstances and purposes of the motion before denying the request. *Id*.

¶ 40    In *Childress*, private counsel appeared before the court on the day the case was set for trial and asked to file an appearance on defendant's behalf. *Childress*, 276 Ill. App. 3d at 410. Counsel requested a continuance because he had not been aware that trial was scheduled for that day. *Id*. The trial court denied his request for a continuance, finding no extraordinary grounds warranting a continuance at such a late date, particularly because the public defender had diligently prepared the case for trial and all the witnesses were present in court. *Id*. We reversed and remanded, holding that the trial court deprived defendant of his counsel of choice by denying the motion, where the case was less than a year old, defendant had never before sought a continuance, and the trial court failed to ask how long a continuance would be needed. *Id*. at 413.

¶ 41    In *Cowan*, the defendant argued his waiver of a jury for sentencing was not "knowing" because the trial judge improperly instructed him that only a unanimous jury could prevent him from receiving a death sentence. *Cowan*, 217 F.3d at 950. The Seventh Circuit Court of Appeals agreed and held that such "affirmative misinformation" necessitated reversal and remandment. *Id*. at 951.

¶ 42    In contrast to *Bingham* and *Childress*, petitioner made no request for a continuance to obtain a new attorney, nor did he identify another attorney whom he wished to represent him. In contrast to *Cowan*, the trial court did not provide petitioner with any affirmative misinformation. Rather, as detailed above, on the first day of trial, the trial court allowed Mr. Howard to spread of record his "ongoing fight" with the ARDC. The trial court then allowed the State to respond, and the State explained that petitioner should be "fully aware" that the ARDC had initiated a disciplinary proceeding against Mr. Howard, "including allegations that he engaged in the unauthorized practice of law during the period of a suspension." The trial court asked if petitioner was aware of the disciplinary proceedings against Mr. Howard, and petitioner responded affirmatively. The trial court then asked petitioner if he had "any problems at all going forward" with Mr. Howard's representation of him, and petitioner responded that he had "a doubt" about Mr. Howard. The trial court sought clarification as to what type of doubt he had, and petitioner stated he doubted Mr. Howard's professional capability. Mr. Howard stated that he did not want to represent petitioner if petitioner had any reservations about his handling of the case. The trial court gave its personal opinion that

-12-

it had confidence in all the attorneys involved, including Mr. Howard, who it stated had a "legendary" reputation around the country. The trial court stated, though, that the issue was not whether the court had any reservations about Mr. Howard but rather, whether petitioner had any such reservations. The trial court then went off the record to allow petitioner to further discuss the matter. Back on the record, the trial court reiterated its confidence in the lawyers involved, but stated it was for petitioner to decide if he wanted to continue to be represented by Mr. Howard. The trial court specifically asked petitioner about his feeling toward Mr. Howard's ability to represent him after having discussed this further off the record. Petitioner stated that Mr. Howard was "very capable" of representing him. The trial court asked petitioner three more times whether he had any doubts about going forward with Mr. Howard, and each time petitioner indicated his readiness to have Mr. Howard continue to represent him. The trial court asked if anyone else wished to add anything, and Mr. Howard asked whether petitioner was concerned that his fight with the ARDC "about a technical matter" would affect his ability to represent petitioner. Petitioner responded he "wouldn't know that." Mr. Howard stated his fight with the ARDC did not affect his ability to represent petitioner, and again asked whether petitioner had any worries about the representation. Petitioner stated he had no doubts about Mr. Howard's ability to represent him. Mr. Howard and the trial court each asked petitioner if he was "certain" about Mr. Howard continuing to represent him, and petitioner twice more stated he was certain.

¶ 43     On this record, we cannot say petitioner has made a substantial showing he was deprived of his sixth amendment right to choice of counsel, where he was informed about Mr. Howard's ongoing fight with the ARDC and given the opportunity to discuss the details of the ARDC matter with him, after which both the trial court and Mr. Howard informed petitioner it was his choice whether to continue to retain Mr. Howard as his attorney. Petitioner gave repeated assurances to the trial court that he was certain he wanted Mr. Howard to represent him. Petitioner cites to his affidavit, in which he stated he never would have agreed for Mr. Howard to continue to represent him if had known "the extent of Mr. Howard's problems with the ARDC." However, as discussed above, the trial court had no obligation to determine the extent of Mr. Howard's disciplinary proceedings so as to ensure that petitioner was aware of every detail thereof. The trial court's obligation was to ensure petitioner's right to the counsel of his own choosing. The trial court met this obligation by giving petitioner the opportunity to speak with Mr. Howard after being informed of his fight with the ARDC and after petitioner expressed some doubt about Mr. Howard's professional capability, and then by receiving multiple assurances from petitioner that he was satisfied with Mr. Howard continuing to represent him.

¶ 44     Petitioner argues, though, that he made a substantial showing that the trial court deprived him of his right to choice of counsel when it "pressured" him not to discharge Mr. Howard. Specifically, petitioner references the trial court's statements to him on the first day of trial that it has "every confidence in all of the lawyers that are involved in this case. The utmost standards and highly qualified, skilled attorneys in this case. Mr. Howard's reputation *** is legendary *** about the country." Petitioner contends these statements unduly pressured him into keeping Mr. Howard as his attorney, as they created an impression that Mr. Howard was an outstanding attorney and that petitioner should feel fortunate to be represented by

-13-

him. Petitioner further argues the "impression was misleading, since, as the ARDC documentation reveals, [Mr.] Howard was at the time struggling to keep up with his clients' cases, was mishandling money, and making misrepresentations to the clients and the court."

¶ 45    The full transcript of the trial court's comments belies petitioner's argument that he made a substantial showing he was deprived of his choice of counsel. Immediately after commenting on Mr. Howard's "legendary" reputation, the trial court stated, "I don't have any reservations, but it's not an issue about whether I have any reservation, the issue is whether or not you have any reservations." The trial court went off the record, then returned and stated, "We had a discussion off the record where I indicated to [petitioner], part of it on the record, I believe, about my confidence in the lawyers who are involved in this trial. But I said to him my feelings aren't important, what is important are his feelings."

¶ 46    Thus, the trial court expressly made clear to petitioner, both on and off the record, that he had to decide for himself whether he was comfortable with Mr. Howard continuing to represent him in the wake of Mr. Howard's disciplinary proceedings with the ARDC, and that the court's opinions and feelings on the issue "aren't important." Instead of requiring petitioner not to discharge Mr. Howard, the trial court gave petitioner the opportunity to discuss the matter further and come to his own decision. The trial court's comments regarding Mr. Howard's "legendary" reputation, while playing a part in petitioner's decision-making process, did not compel him to retain Mr. Howard as his attorney. The decision was entirely petitioner's, and it was made only after the trial court gave him the chance to discuss his concerns with Mr. Howard and after the trial court confirmed, multiple times, that petitioner wanted to "go forward" with Mr. Howard. Accordingly, petitioner has not made a substantial showing he was deprived of his counsel of choice.

¶ 47    Petitioner argues that, in dismissing his amended petition, the postconviction court improperly failed to accept the facts pleaded in the amended petition and supporting documentation as true. Petitioner contends the amended petition and supporting documentation indicated that petitioner was not aware of all the details of Mr. Howard's disciplinary problems, and that he felt pressured by the trial court not to discharge Mr. Howard. As discussed above, even taking these allegations as true, the record shows that the trial court told petitioner he had to decide for himself whether to retain or discharge Mr. Howard, and the trial court gave petitioner the opportunity to speak with Mr. Howard regarding his disciplinary proceedings with the ARDC. The trial court then received multiple assurances from petitioner that he wanted to retain Mr. Howard as his counsel. On these facts, petitioner has not made a substantial showing he was denied his choice of counsel.

¶ 48    Next, petitioner contends he made a substantial showing that Mr. Howard provided ineffective assistance of counsel by failing to consult a forensic expert, who could have testified at trial that the physical evidence found at the crime scene contradicted the testimony of the sole eyewitness (Junior). In support, petitioner cites the written declaration of Kenneth Moses, the director of Forensic Identification Services in San Francisco, California, in which he stated that the location of the shell casings and of Ms. Chotoosingh's entry bullet wounds contradicted Junior's testimony regarding the shooter's location when he shot at her underneath the bed.

¶ 49    To determine whether petitioner was denied his right to effective assistance of counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, petitioner must show "counsel's representation fell below an objective standard of reasonableness" (*Id*. at 688), and second, that he was prejudiced such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Petitioner's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats his ineffectiveness claim. *People v. Palmer*, 162 Ill. 2d 465, 475 (1994).

¶ 50    Petitioner has not made a substantial showing he was prejudiced by Mr. Howard's decision not to consult with and call the forensic expert at trial. The forensic expert, Mr. Moses, would only have testified that Junior inaccurately testified to the manner in which Ms. Chotoosingh was shot. However, two other people also were shot and killed, Senior and Mr. Mason. Mr. Moses did not offer any criticism of Junior's account of those shootings. Junior positively identified petitioner as the shooter. In addition to Junior's testimony, Mr. Williams testified he also was present at the time of the shooting, and although he did not see the shooter, he heard Junior identify the shooter as the petitioner. Mr. Torrence testified that petitioner confessed to the shootings and admitted fleeing to Las Vegas with a large sum of money. FBI agents arrested petitioner in a Las Vegas motel room, where they found in excess of $100,000 in cash. Given all this evidence against petitioner, he has failed to make a substantial showing of prejudice, *i.e.*, of a reasonable probability that the result of the proceeding would have been different had Mr. Howard consulted with and called the forensic expert at trial.

¶ 51    For all the foregoing reasons, we affirm the dismissal of petitioner's amended postconviction petition.

¶ 52    Affirmed.